MURPHY TUGBOAT COMPANY, Plaintiff,

v.

SHIPOWNERS & MERCHANTS TOWBOAT CO., LTD. et al., Defendants.

SHIPOWNERS & MERCHANTS TOWBOAT CO., LTD. et al., Counter-Claimants,

v.

MURPHY TUGBOAT COMPANY, Counter-Defendant.

No. C–74–0189–WWS.

United States District Court, N. D. California.

March 6, 1979.

Ronald Lovitt, Lovitt & Hannan Inc., San Francisco, Cal., Robert L. Palmer, Martori,

Meyer, Henricks & Victor, Phoenix, Ariz., Thomas Elke, Tucson, Ariz., for plaintiff and counter-defendant.

Richard J. Archer, Kristina M. Hanson, Sullivan, Jones & Archer, San Francisco, Cal., for defendants and counter-claimants.

## MEMORANDUM OPINION AND ORDER ON MOTIONS FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL

WILLIAM W SCHWARZER, District Judge.

Plaintiff charges defendants with having violated Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 17045 of the California Business and Professions Code.[1] After 28 days of trial and 5 days of deliberation, the jury returned a verdict awarding plaintiff damages aggregating $700,000. Defendants have moved for judgment notwithstanding the verdict or alternatively for a new trial.

### I. *The Factual Background*

The relevant facts established at the trial may be summarized as follows. Defendants Shipowners & Merchants Towboat Co., Ltd. ("Red Stack") and Bay Cities Transportation Company ("Bay Cities") have for many years been engaged in ship assisting and ship towing on San Francisco Bay and its tributaries. Although until recently a small percentage of Red Stack's capital stock was held by outsiders, both companies have at all material times been substantially owned and controlled, directly or indirectly, by the Crowley family. Major decisions by the management of either company have required the approval of defendant Thomas B. Crowley, who was the principal officer of each of the companies. Beginning about 1973, Crowley Maritime Corporation ("Crowley Maritime") became the holding corporation of these companies and gradu-

---

1. Section 17045 prohibits the making of secret payments to the injury of competitors where such payments tend to destroy competition. Both plaintiff in its complaint and defendants in their counterclaim complained of violations.

The jury declined to award damages to either party. Inasmuch as no party has taken exception to this part of the verdict, the Court will not consider this phase of the case.

ally undertook to provide various administrative services. So far as the record shows, however, it engaged in no operations and performed no acts relevant to the matters at issue.

Plaintiff Murphy Tugboat Company ("Murphy") entered the ship assist business on San Francisco Bay about October 1971 ·with a single tug. It remained in business, acquiring additional tugs, until September 1975 when ship assist operations were discontinued.

Ship assist work consists of providing tugs to aid vessels in docking or undocking. Vessels are docked or undocked in a variety of ways, depending on their size and configuration, tide ·and weather conditions, the qualifications of the master or pilot, and other circumstances. They may or may not employ an inland pilot to assist in docking or undocking, and they may choose to dock or undock without tugs or with the aid of one or more tugs.

In addition to assisting vessels in docking or undocking, tugs from time to time perform so-called flat tows, i. e., shifting vessels not under power between locations on the Bay.

Murphy entered the ship assist business about 18 months following the end of a six-months tug strike which had idled Red Stack and Bay Cities. During that strike, other companies had entered the ship assist business in the area, including Murphy-Pacific Marine Salvage Corporation, which had acquired the use of· some seven tugs. Roger Murphy, who subsequently organized and largely owned plaintiff Murphy Tugboat Company, headed the ship assist operations for Murphy-Pacific, which was also engaged in the construction and salvage business. After defendants resumed their operations, Murphy-Pacific began to suffer substantial losses in its ship assist operations and ultimately agreed to sell its tugs to the Crowley interests in June 1971. There is evidence which, although disputed by defendants, would have permitted the jury to find that as a part of that transaction Murphy-Pacific agreed to stay out of the ship assist business.

For some years prior to Murphy's entry into the ship assist business, Red Stack and Bay Cities had a policy of refusing, except in emergencies, to provide service to a vessel which was also being assisted by tugs of another company. Thus, if a vessel had arranged for ship assist services with another tugboat company, and more tugs were required for the job than that company could furnish, Red Stack and Bay Cities would decline to furnish the additional tugs to work with the tug of the other company. Defendants gave as a reason for the policy the hazards of divided responsibility in ship handling. Other Crowley controlled companies operating in Los Angeles harbor and Puget Sound, and other tugboat companies operating ·in New York harbor, did not adhere to such a policy.

During the period at issue, Red Stack and Bay Cities performed not less than 70 percent of the tug-assisted docking and undocking on San Francisco Bay (excluding military and other proprietary operations). The services of these companies were offered under two different tariffs. Bay Cities, operating smaller tugs, served primarily smaller vessels (i. e., less than 14,000 net tons). It charged a flat rate per tug, plus overtime. Red Stack, operating larger, more powerful tugs, generally served the larger vessels. Its charges were computed under a grid tariff which took into account the size of the vessel and the length of the ship assist move and generally produced higher charges.

The thrust of Murphy's case at trial was that defendants' policy of refusing to work with competitors effectively excluded it from the large vessel segment of the ship assist market, where most of the demand for multi-tug jobs arose. There was evidence from which the jury could find that potential customers were deterred from hiring a Murphy tug by the knowledge that if the need for additional tugs arose during the operation, defendants would not provide them.

Murphy contended that but for defendants' exclusionary practice, its share of the large vessel market would have been equal

to the 28 per cent share it held of the small vessel market. In that event, it would have been able either to raise its rates or increase its volume substantially, resulting in additional revenue which it claimed would have eliminated the operating losses plaintiff incurred between 1972 and 1976.

Murphy also charged that Red Stack had entered into an unlawful conspiracy with the Red Stack pilots' association to fix the fees collected by Red Stack masters for pilotage services rendered by them on Red Stack jobs. Red Stack had for many years offered pilot services along with ship assist services; it was able to do so because the masters of its tugs were licensed inland pilots, and its tugs had five men crews. When Red Stack tugs assisted a vessel, the master of one of the tugs would, at the vessel's request, go on the bridge and serve as pilot. While Red Stack made no extra charge for this service, the master/pilot collected a fee from the vessel. The amount of that fee was set by agreement between Red Stack and the association. During the relevant time, the fee varied, depending on the specific job, but it was always considerably less than the fees charged by independent pilots. Murphy contended that the Red Stack pilots' agreement, by holding down the pilotage component of the package cost of using Red Stack's service, made it necessary for Murphy to hold down its tug charges so that the combined charge for the Murphy Tug-independent pilot package would remain competitive. As a result, Murphy claimed, it lost revenue which it would have realized had it been able either to raise its charges or to attract more jobs by reason of a greater price differential.

Murphy's damage proof consisted of evidence of its operating losses (reflected on its federal income tax returns) for the four fiscal years ended August 31, 1972, 1973, 1974 and 1975, as well as the loss suffered during fiscal 1976 following the shutdown of its operations. These losses totaled $490,936. In addition, Murphy computed its lost profits for the five succeeding years by applying to its average annual gross revenue of $435,928 the lowest net profit ratio experienced by Bay Cities during this period—8.2 percent. This resulted in a hypo-

thetical annual profit of $35,756, or $178,730 for the five-year period. The total amount of damages claimed was $669,666. The jury awarded damages for violation of Section 2 aggregating $700,000, assessed as follows:

$160,000 against Red Stack,

80,000 against Bay Cities,

180,000 against Crowley Maritime Corp., and

180,000 against Thomas B. Crowley.

In addition, the jury awarded $100,000 against Red Stack for violation of Section 1 by reason of the Red Stack pilots' agreement. No verdict was reached on the remaining conspiracy claims. (See Exhibit A, attached.)

## II. *The Standard of Review*

■ Defendants' motion for judgment n. o. v. is governed by the same standards as a motion for directed verdict. The Court is bound to view the evidence in the light most favorable to the non-movant, drawing all permissible inferences in its favor. If, by that standard, there is substantial evidence to support a finding by a reasonable jury, the motion must be denied. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 909 (9th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978).

The foregoing standard is applicable to the issues on which the jury returned a verdict for plaintiff (monopolization, attempt to monopolize, the Red Stack pilots' agreement as a violation of Section 1, and damages). With respect to those issues on which the jury failed to reach agreement (other violations of Section 1 and conspiracy to monopolize), defendants' motion will be treated as one for a directed verdict governed by the same standard.

## III. *Monopolization and Attempt to Monopolize*

### A. *Liability of Bay Cities and Red Stack*

#### 1. *Monopolization*

■ To establish the offense of monopolization, plaintiff must prove (1) possession

of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The relevant geographic market is the area of effective competition defined in terms of where buyers can turn for alternative sources of supply. *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977). The relevant product market consists of commodities or services reasonably interchangeable by consumers for the same purpose. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

There is no serious dispute that the relevant geographic market must be confined to San Francisco Bay, and the record would permit no different finding. To bring tugboats into the Bay to perform particular jobs would be prohibitive in terms of both money and time. The boundaries of the Bay for this purpose may not be clearly established—i. e., it may or may not be feasible, in view of the running time, to perform San Francisco-Oakland jobs with tugs based as far away as Benicia—but in view of defendants' overwhelming share of the ship assist business on the Bay, regardless how delineated, further refinement is unnecessary.

■ Defendants argue that the product (or service) market must include doing without commercial tug service, i. e., docking or undocking without tugs or with the use of inhouse tugs. The alternative of doing without is present in the market for virtually every product or service, except perhaps air or water. The readiness with which consumers will resort to the alternative is a function of the relationship of demand to supply, an element of every market. Thus, demand for a product or service

may be more or less elastic, depending on circumstances. The degree of elasticity, however, does not aid in defining the limits of the product or service market in terms of reasonable alternatives; it is more properly taken into account in determining the degree of monopoly power possessed by the supplier once the market has been defined.

■ Defendants also seek to include jobs performed by tugs operated by the Navy and by the Standard Oil Company. Inasmuch as these tugs during the relevant period served only vessels operated by the Navy and Standard Oil, respectively, and were not available to serve the public, they did not offer an alternative source of ship assist services. The market must therefore be limited to commercial ship assist jobs. *See SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3rd Cir. 1978).

■ There was evidence from which the jury could find that defendants' share of the market based on revenue exceeded 80 percent. In addition, according to defendants' own contemporary records, between 1971 and 1975 Bay Cities and Red Stack together performed over 70 percent of the commercial ship assist jobs, even if so-called no tug jobs are included. No competing firm ever performed more than 15 percent of the jobs. Given the size of defendants' market share, there was substantial evidence to sustain a finding that defendants together possessed the power to exclude competition or control prices,[2] and hence monopoly power in the relevant market.[3] *See United States v. du Pont & Co., supra*, 351 U.S. at 391, 76 S.Ct. 994; *Greyhound Computer Corp., Inc. v. International Business Machines Corp.*, 559 F.2d 488, 496 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2nd Cir. 1945).

2. There was, in addition, evidence that the rates charged by defendants were treated as the going rate and were followed by others performing ship assist services on the Bay.

3. Inasmuch as Bay Cities and Red Stack were commonly owned and controlled, their market shares may reasonably be aggregated for purposes of determining whether they possessed monopoly power. The fact that they chose to behave as separate firms competing with each other in the market (*see* Part V. A. *infra*) does not eliminate the existence of *power* derived from their combined market share by the person controlling their operations, regardless of whether it was exercised.

Defendants presented evidence from which it could be found that the demand for their services was relatively elastic. Thus, during the 1969–1970 strike, many vessels were docked and undocked without the use of tugs. After the strike, however, the use of tugs was resumed; the decline in the number of tug jobs in the post-strike period may have been attributable as much to the decline in shipping accompanying the winddown of the Vietnam war as to vessels doing without tugs. Defendants also showed that bow thrusters, which improve vessel maneuverability and control, are being installed in increasing numbers, reducing the demand for tugs. All of this evidence could be considered by the jury but did not preclude a finding that defendants possessed the requisite monopoly power.

There remains the question whether defendants were guilty of willful acquisition or maintenance of that power. Defendants presented evidence reflecting the quality of their service and equipment and the large amount of goodwill gained by them over the years in support of the claim that, if defendants had monopoly power, it was the result of their superior service or business acumen. See United States v. Grinnell Corp., supra, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778.

There was, however, abundant evidence to warrant the jury's rejection of that contention. Among other things, that evidence showed that the Crowley companies acquired the tugs of Murphy-Pacific Marine Salvage Corporation and a surplus tug put up for sale by Standard Oil Company although they considered this equipment inferior and had little if any use for it. There was evidence, albeit hotly disputed, that the purchase from Murphy-Pacific may have been accompanied by an agreement not to compete; certainly, the vigorous reaction of Crowley management to the appearance on the Bay of the Captain William, a 48-year-old, low-power tug which Roger Murphy had purchased shortly after the Murphy-Pacific sale, tends to confirm their expectation that no competition would appear from that quarter.[4]

The principal support for the jury's verdict is found in defendants' policy of refusing to work on ship assist jobs with the tugs of competitors except in emergencies. Defendants contended that this policy was a reasonable measure to assure that jobs would be performed safely and competently and to minimize their exposure to claims and litigation. The jury was entitled to weigh against that justification the evidence that neither the Crowley-controlled tugboat operations in Los Angeles harbor and Puget Sound nor other tugboat companies in New York harbor followed such a policy. There was, moreover, evidence that the tendency of the policy was to deter vessel owners, agents, and pilots from using plaintiff's tugs. In this connection, the evidence showed that shipowners and agents, knowing that defendants would not work on a job with Murphy tugs, were deterred from hiring Murphy, particularly for larger vessels requiring more tugs or where, because of tide or wind conditions, the possibility existed that additional tugs might have to be called in to assist. Since Murphy never had more than two large tugs in service, it lacked the capability to assure customers that its own equipment could meet whatever needs might arise in the course of the job.[5]

4. Lester Bedient, then president of Bay Cities, cabled Thomas Crowley, who was on vacation in Switzerland, to report this event and advise that he would contact the union about it.

5. From August 1971 to May 1972, Murphy Tugboat had only one small tugboat on the Bay. From May 1972 to June 1973, it had one large tug, one small tug, and another small tug for several months. From June 1973 to September-October 1974, it had in service on the Bay two large tugs, a small tug, and another small tug for three months. From October 1974 to April 1975, it had only one large tug on the Bay. From April 1975 to September 1975, when operations ceased, the company had one large tug and one small tug.

Thus, for the four years of its operation, Murphy Tugboat had two large tugboats for only one and one-half years. For approximately two years, it had only one large tug. For one-half year, it had only a small tug. Murphy had four vessels on the Bay (two large tugs and two small tugs) for only three months in 1973.

Defendants are, of course, under no legal duty to supply equipment to remedy plaintiff's deficiencies or to help it get jobs. *Cf. Scanlan v. Anheuser-Busch, Inc.,* 388 F.2d 918, 920–21 (9th Cir.), *cert. denied,* 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968). Nor are they precluded from adopting reasonable practices to protect themselves against liability for the acts of others. But the policy pursued by defendants, whatever its business justification, also had anti-competitive effects. As already noted, prospective customers were deterred from employing Murphy by the knowledge that defendants would not supply tugs to assist on a Murphy job if needed. It is one thing for defendants to attract the business of customers by reason of their superior capacity to supply whatever tugs may be needed for a job. It is quite another, however, to reinforce their dominant market position by a restrictive rule against working on jobs on which competitors are employed. Given their market position, defendants were "precluded from employing otherwise lawful practices that unnecessarily excluded competition." *Greyhound Computer Corp. v. International Business Machines, supra,* 559 F.2d at 498.

This record amply supports the jury's verdict for plaintiff on the monopolization issue.

### 2. *Attempt to Monopolize*

■ An attempt to monopolize is established by proof that defendants, even if they failed to monopolize the market, nevertheless had a specific intent to monopolize and engaged in predatory conduct directed to accomplishing their unlawful purpose. *Moore v. Jas. H. Matthews & Co., supra,* 550 F.2d at 1219. Proof of specific intent can be supplied by inference drawn from proof of predatory or anticompetitive conduct which constitutes a restraint of trade. *Gough v. Rossmoor Corp.,* 585 F.2d 381, 389–90 (9th Cir. 1978); *Knutson v. Daily Review, Inc.,* 548 F.2d 795, 814–815 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).

■ The evidence of defendants' practice of refusing to work on vessels with competitors, which the Court has found sufficient to support a finding of monopolization, coupled with the other evidence previously discussed raising an inference of intent to exclude competitors, is sufficient to support the verdict here. *See Janich Bros. Inc. v. American Distilling Co.,* 570 F.2d 848, 854 n. 4 (9th Cir. 1977), *cert. denied,* —— U.S. ——, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

### B. *Liability of Thomas B. Crowley and Crowley Maritime Corporation*

### 1. *Thomas B. Crowley*

■ It is undisputed that Thomas B. Crowley was at all material times defendants' chief executive officer with authority to exercise control over their operations. The Ninth Circuit has said that "[t]he individuals through whom a corporation acts and who shape its intentions can be held liable on a charge of attempted monopolization." *Tillamook Cheese & Dairy Association v. Tillamook County Creamery Association,* 358 F.2d 115, 118 (9th Cir. 1966). But neither the facts of that case nor the decisions cited in support of this proposition disclose *under what circumstances* an officer or a director may be held liable under the antitrust laws for his corporation's Section 2 violation.[6]

---

**6.** Plaintiff's brief is of little assistance here. It relies primarily on *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), and *Hartford-Empire Co. v. United States,* 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322 (1945), both of which were government suits for injunctive relief and do not address the issue of liability for damages for past conduct. Plaintiff's contention that a treble damage judgment was subsequently rendered against both the corporate and individual defendants in the *Lorain Journal* litigation is apparently in error. *See Elyria-Lorain Broadcasting Co. v. Lorain Journal Co.,* 298 F.2d 356, 357 (6th Cir. 1961) ("plaintiff radio station had begun a civil action for treble damages against the newspaper . . ."). In any event, there is no discussion whatever in the cited decisions of liability of officers or directors. *Hartford-Empire,* to the extent it has any bearing on the present issue, simply confirms the necessity of proof of participation by the individuals in acts constituting steps in the progress of the wrongful conduct. 323 U.S. at 407, 65 S.Ct. 373.

■ Basic principles of tort and agency law provide the starting point for defining those circumstances. An agent "who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal." *Restatement (Second) of Agency* § 343 (1957). Applied to corporations, this rule of agency law means that "[a]n officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Ballantine, Corporations* § 112 (rev. ed. 1946). Courts have, however, consistently stated that a corporate executive will not be held vicariously liable, merely by virtue of his office, for the torts of his corporation. *Tillman v. Wheaton-Haven Recreation Association,* 517 F.2d 1141, 1144 (4th Cir. 1975); *Martin v. Wood,* 400 F.2d 310, 313 (3d Cir. 1968); *Armour & Co. v. Celic,* 294 F.2d 432, 439 (2d Cir. 1961). Personal liability must be founded upon specific acts by the individual director or officer. *Tillman v. Wheaton-Haven Recreation Association, supra,* 517 F.2d at 1144; *Davis H. Elliot Co. v. Caribbean Utilities Co.,* 513 F.2d 1176, 1182 (6th Cir. 1975). The few antitrust decisions considering this issue have also underscored the need for participation in the tort by the executive. *Higbie v. Kopy-Kat, Inc.,* 391 F.Supp. 808, 810 (E.D.Pa.1975); *Deaktor v. Fox Grocery Co.,* 332 F.Supp. 536, 542 (W.D.Pa.1971), aff'd, 475 F.2d 1112 (3d Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973); *Bergjans Farm Dairy Co. v. Sanitary Milk Producers,* 241 F.Supp. 476, 482 (E.D.Mo.1965), aff'd, 368 F.2d 679 (8th Cir. 1966).

■ Participation may be found not solely on the basis of direct action but may also consist of knowing approval or ratification of unlawful acts. *E. g., Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3rd Cir. 1978) (corporate officer arranged for the use and copying of materials constituting unfair competition); *Tillman v. Wheaton-Haven Recreation Association, supra,* 517 F.2d 1141 (directors of the association promulgated and enforced a white-only membership policy); *Solo Cup Co. v. Paper Machinery Corp.,* 359 F.2d 754 (7th Cir. 1966) (president of corporation, who arranged for the employment of plaintiff's former engineer and negotiated for the sale of machines in anticipation of the engineer's ability to duplicate plaintiff's machine, was liable to plaintiff for damages based on unfair competition); *Barry v. Legler,* 39 F.2d 297 (8th Cir. 1930) (officer had knowledge of misrepresentations made by agents under his control in connection with the sale of stock yet failed to act); *McCrea v. McClenahan,* 131 App. Div. 247, 115 N.Y.S. 720 (Sup.Ct.1909) (president of corporation personally converted plaintiff's chattels).

Such approval or ratification must, however, be of acts or conduct which are inherently unlawful. *See, e. g., Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 409 (10th Cir. 1958) (emphasis added), where the court stated:

"Specific direction or sanction of, or active participation or cooperation in, a *positively wrongful act of commission or omission* which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation."

The principle is reflected in Section 2343 of the California Civil Code, which provides:

"AGENT'S RESPONSIBILITY TO THIRD PERSONS. One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others:

"1. When, with his consent, credit is given to him personally in a transaction;

"2. When he enters into a written contract in the name of his principal, without believing, in good faith, that he has authority to do so; or

"3. *When his acts are wrongful in their nature.*" (emphasis added)

The application of this principle to cases in which Sherman Act liability is sought to be imposed for past conduct is supported by sound reasons, most recently explicated by the Supreme Court in *United States ·v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). Although that case involved the imposition of criminal liability under the antitrust laws, the underlying policy considerations have a bearing as well on the civil liability of officers for corporate violations. After noting that "judicial elaboration of the Act [has not] always yielded the clear and definitive rules of conduct which the statute omits" and that "the behavior proscribed by the Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct," *id.* at 438, 440, 98 S.Ct. at 2874, 2875, the Court stated:

> "[W]here the conduct proscribed is difficult to distinguish from conduct permitted and indeed encouraged, as in the antitrust context, the excessive caution spawned by a regime of strict liability will not necessary [*sic,* necessarily] redound to the public's benefit. The antitrust laws differ in this regard from, for example, laws designed to insure that adulterated food will not be sold to consumers. In the latter situation, excessive caution on the part of the producers is entirely consistent with the legislative purpose." *Id.* at 442, 98 S.Ct. at 2876 n. 17.

The generality of the Act's prohibition, the often uncertain line between proper and improper conduct, and the social interest in not deterring economically useful conduct by the imposition of excessive risks—all of which the Supreme Court recognized in *United States Gypsum*—make it appropriate to limit personal liability to cases of participation in inherently wrongful conduct.[7] The only reported cases involving

the imposition of personal liability appear to be consistent. *See Bergjans Farm Dairy Co. v. Sanitary Milk Producers, supra,* 241 F.Supp. 476 (individual corporate officers of the dominant dairy firm in the market held liable for violation of Sections 1 and 2 where they knowingly participated in or approved a course of conduct which included predatory price reductions, payment and false reporting of secret rebates, pressuring customers to accept exclusive supply contracts and buying out those who would not cooperate); *Kentucky-Tennessee Light & Power Co. v. Nashville Coal Co.,* 37 F.Supp. 728 (W.D.Ky.1941), *aff'd,* 136 F.2d 12 (6th Cir. 1943) (affirming denial of motion to dismiss charges of violation of Robinson-Patman Act against officer who accepted bribes from coal company to induce him to cause his corporation to make coal purchases).

█ The evidence of Thomas Crowley's conduct does not sustain a finding of participation in inherently wrongful conduct. His direct participation was limited to the purchase of the Murphy Pacific tugs which, even if coupled with a non-competition covenant, was not inherently wrongful. *Cf.* California Business & Professions Code § 16601; *Monogram Industries, Inc. v. Sar Industries, Inc.,* 64 Cal.App.3d 692, 134 Cal. Rptr. 714 (1976). While he must be assumed, as chief executive officer, knowingly to have approved or ratified the policy of refusing to work vessels with competitors, that policy also cannot be said to be inherently wrongful. It violates no per se prohibition (*see* p. 861 *infra*), is supported by legitimate business considerations, and is simply evidence of monopolization or an attempt to monopolize when viewed in the light of all the surrounding facts and circumstances. In the absence of evidence of knowing approval of inherently wrongful acts, Thomas Crowley cannot be held personally liable for the corporate defendants'

7. That statement is not intended to suggest that proof of unlawful intent is necessary to impose civil liability on officers. Although that argument has been advanced by some commentators, *see* Whiting, *Antitrust and the Corporate Executive* (pt. I), 47 *Va.L.Rev.* 1938 (1965),

Note, *The Antitrust Laws and the Corporate Executive's Civil Damage Liability,* 18 *Vand.L. Rev.* 1938 (1965), there is no warrant in the authorities previously discussed to impose a requirement which would in effect equate the standard of proof for civil and criminal liability.

violation of Section 2. He is therefore entitled to judgment.

### 2. *Crowley Maritime Corporation*

Crowley Maritime became the holding company of Bay Cities and Red Stack sometime after 1973. It owned substantially all of their stock and shared common officers and directors with them. Its activities were substantially limited to providing computer and other corporate support services having no bearing on the matters in issue. There is no evidence that it engaged in any operations, let alone that it participated in any possibly unlawful practice or conduct.

■■■■ Crowley Maritime can therefore not be held liable for having participated directly in the antitrust violations. If liability is to be imposed, it would have to be on the theory that Crowley Maritime is responsible for the acts of its subsidiaries. But a parent corporation is not liable for its subsidiaries' acts simply because the parent owns all the stock of the subsidiaries and shares common officers and directors. *Steven v. Roscoe Turner Aeronautical Corp.,* 324 F.2d 157, 161 (7th Cir. 1963); *Spears v. Transcontinental Bus System,* 226 F.2d 94, 98 (9th Cir. 1955), *cert. denied,* 350 U.S. 950, 76 S.Ct. 326, 100 L.Ed. 828 (1956); Annot., 7 A.L.R.3d 1343, 1350–51 (1966). The evidence would have to show that the subsidiary was a mere instrumentality of the parent, indicated by such facts as inadequate capitalization, absence of independent activity, action in the interest of the parent rather than the subsidiary, and failure to observe the legal requirements of separate corporate existence. *Steven v. Roscoe Turner Aeronautical Corp., supra,* 324 F.2d at 161; Annot., 7 A.L.R.3d 1343, *supra,* at 1354–55. None of those factors is present here. On the contrary, Bay Cities and Red Stack were held out to be and acted as separate and independent operational and economic entities. (*See* Part V. A. *infra.*)

Crowley Maritime is therefore entitled to judgment.

### IV. *The Red Stack Pilots' Agreement*

#### A. *Capacity to Conspire*

The jury found the agreement between Red Stack and the pilots' association to be an agreement in unreasonable restraint of trade, presumably on the theory that it operated to fix the fees charged by Red Stack masters for performing pilot services. Assuming plaintiff to have standing under Section 4 of the Clayton Act,[8] the threshold question is whether the agreement falls within the ambit of Section 1.

The undisputed evidence establishes that an informal association of Red Stack masters was formed in 1946. The masters had been performing pilotage services for Red Stack customers for many years but had not received extra compensation for this service. About 1946, the Masters, Mates and Pilots Union, representing these masters, asked that they be permitted to charge a fee for providing this service. Red Stack agreed to a then pilotage fee of $5 or $10,

---

8. Whether plaintiff, as a competitor of defendant Red Stack, has standing under the antitrust laws to attack an agreement between Red Stack and an association of its employees which has a tendency to place a ceiling on the price charged by Red Stack for the package of services it offers in competition with plaintiff is a matter not free from doubt. While plaintiff and defendants were engaged in the same "area of the economy," it does not follow that injury caused plaintiff by reason of a competitive advantage gained by defendants through an agreement controlling a component of the total price of their service is injury "by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15; *In re Multidistrict Vehicle Air Pollution MDL No. 31,* 481 F.2d 122, 125–29 (9th Cir.), *cert. denied,* 414 U.S. 1045 (1973); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487–89, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Plaintiff has cited no cases supporting recovery under Section 4 of the Clayton Act based on conduct by a competitor enabling him to price below plaintiff, and a court should be loath to entertain attacks on arrangements (not shown to have exclusionary effects) between persons who are not competitors the purpose of which is to lower the cost of goods or services to consumers. *See generally Murphy Tugboat Co. v. Crowley,* 454 F.Supp. 847 (N.D.Cal.1978). In view of the disposition of this branch of the case, however, it is unnecessary to untangle this particular web; the court will therefore assume without deciding that plaintiff has standing.

depending on the move, to be paid by the vessel requesting the service, and it was in conjunction with this agreement that the association was formed.

The association collects the fees and disburses the proceeds. There is no evidence that it performs any significant additional functions other than to negotiate with Red Stack concerning the level of the fee to be charged.

"Antitrust law is concerned with the concerted action of distinct economic entities." *Knutson v. Daily Review, Inc., supra,* 548 F.2d at 802. Agreements must be judged in the light of the purpose of the antitrust laws to prevent restraints on competitive economic behavior. Because an agreement between a corporation and its employees does not restrain competition, it cannot form the basis for a conspiracy claim under Section 1 of the Sherman Act. *Chapman v. Rudd Paint & Varnish Co.,* 409 F.2d 635, 643 n. 9 (9th Cir. 1969); *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc.,* 531 F.2d 910, 917 (8th Cir. 1976); *Nelson Radio & Supply Co., Inc. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir. 1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). The agreement at issue here—which is the raison d'etre of the association—is one between a group of employees and their common employer concerning the amount of extra compensation they may collect from their employer's customers for rendering extra service to them during their regular working hours. It imposes no restraint on competitive or other independent economic activity of the association (which has no such purpose or function)[9] or

its members. It must therefore be considered as being outside the ambit of Section 1.[10]

### B. *Application of the Labor Exemption*

The jury found that the agreement between Red Stack and the Red Stack pilots was not intimately related to the wages or working conditions of the members of the association as Red Stack employees and therefore not exempt.

The members of the association, all of whom were masters on Red Stack tugs, were employees of Red Stack. Their services as pilots were performed during the time when they were employed by Red Stack and the Red Stack tugs on which they worked were performing ship assist services on behalf of Red Stack for Red Stack customers. None of the services subject to the agreement was performed by the masters independently of their employment by Red Stack.

In *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 689, 85 S.Ct. 1596, 1602, 14 L.Ed.2d 640 (1965), the Supreme Court held that the labor exemption of the Sherman Act (15 U.S.C. § 17) applies to agreements and restrictions which "like wages, and unlike prices, [are] . . . intimately related to wages, hours and working conditions." In that case, the question involved a union demand that sales of meat by all markets be restricted to the hours of 9 a. m. to 6 p. m. The Court held that "the particular hours of the day . . . during which employees shall be required to

---

**9.** While plaintiff has at times contended that the Red Stack pilots' agreement somehow ran afoul of the prohibition against tying, there is no evidence whatever to support such an argument. Nothing in the record suggests that Red Stack required or even requested that its customers also use Red Stack masters as pilots; vessels were entirely free to use the (more expensive) services of independent pilots. Nor were Red Stack pilots precluded from rendering services outside working hours on whatever terms they might negotiate.

**10.** Suppose the Red Stack pilots' agreement had simply prohibited the Red Stack pilots

from charging for pilotage service performed while engaged in their duties as Red Stack employees. The result would have been to increase the price differential between the two packages to plaintiff's disadvantage. But could plaintiff complain of a rule imposed by an employer prohibiting his employees from collecting fees for themselves from his customers? Such an apparently reasonable restriction on one's employees would not seem to be an antitrust violation. If that is true, it is difficult to see how a more limited understanding with one's employees having a lesser impact on competitors could be found to be unlawful.

work are subjects well within the realm of 'wages, hours, and other terms and conditions of employment' about which employers and unions must bargain." 381 U.S. at 691, 85 S.Ct. at 1602. It then went on to say:

"And, although the effect on competition is apparent and real, perhaps more so than in the case of the wage agreement, the concern of union members is immediate and direct." *Id.*

Given that test, it is immaterial that, as plaintiff contends, the services performed by the masters as pilots may technically have been outside the scope of their employment.[11] The level of pilotage fees (whatever their effect on competition between Red Stack and independent pilots and tugs) being received in connection with the masters' employment clearly had an effect on their total compensation and hence was a matter of "immediate and direct" concern for them. That concern is borne out by the genesis of the agreement, which was the demand of the masters for permission to charge fees. Given such a demand upon their employer Red Stack, some agreement on the subject between the employer and a representative of the masters was virtually inevitable. That the employee representative for this purpose is someone other than the regular collective bargaining representative and that the subject of the agreement is compensation collected from a third party does not diminish the immediate and direct concern of these employees in this aspect of their compensation. *See NLRB v. Harrah's Club*, 403 F.2d 865, 873–75 (9th Cir. 1968); *Mitchell v. Gibbons*, 172 F.2d 970 (8th Cir. 1949). Nor is the labor exemption rendered inapplicable by reason of any impact of the agreement on price. *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968).

There is in this case the additional factor of the employer's legitimate concern that the activities of its employees while on the job, particularly the level of compensation collected by them from the employer's customers during the employees' working hours, should be regulated.

Under these circumstances, it must be concluded that the agreement is exempt as a matter of law.

### C. Damages

The jury awarded plaintiff damages of $100,000 for injury caused by the Red Stack pilots' agreement.

The only damage evidence offered by plaintiff pertaining to this agreement consisted of Exhibit 608 and testimony by plaintiff's expert, Professor McFadden. Exhibit 608 showed that on ships over 14,000 tons, the average Red Stack package cost (i. e., the tug charge plus the pilotage fee as fixed by the agreement) was at all times twice as high or higher than the average package cost of using plaintiff plus the more expensive independent pilot.

11. Plaintiff points to a clause in the agreement stating that Red Stack shall not be liable for the acts of its employees when they are serving as pilots. But this clause is merely an attempt by Red Stack to relieve itself from liability; it does not change the essential fact that the pilotage services are furnished in connection with and as a result of the masters' employment by Red Stack. Moreover, the cases cited by plaintiff, even if relevant, do not support its contention that the masters are not acting within the scope of their employment when they perform pilotage services. *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 92–95, 75 S.Ct. 629, 99 L.Ed. 911 (1955); *Sun Oil Co. v. Dalzell Towing Co.*, 287 U.S. 291, 294–95, 53 S.Ct. 135, 77 L.Ed. 311 (1932); *United States v. SS President Van Buren*, 490 F.2d 504–07 (9th Cir. 1973); and *California v. S/T Norfolk*, 435 F.Supp. 1039, 1046–47 (N.D.Cal.1977), state no more than that for purposes of determining a vessel's liability, a pilot is considered the employee of the vessel he is navigating, not of the tug. That conclusion does not imply that the pilot cannot at the same time be viewed as acting within the general scope of his employment for purposes of applying the labor exemption especially where, as here, his pilotage is a direct result of his employment by the tug. Finally, plaintiff argues that the pilots' fees are not included in the W–2 statements issued by Red Stack and that the union's collective bargaining agreement does not discuss the pilotage work. But this contention, like plaintiff's other theories, ignores the totality of the circumstances of the Red Stack pilots' working conditions which give rise to the piloting services.

Even on the smaller vessels, the average Red Stack package cost substantially exceeded the average Murphy package cost at all times.

Inasmuch as plaintiff could therefore not argue that the relative magnitude of pilotage fees placed it under a competitive disadvantage, its theory, as articulated by Professor McFadden, was that had Red Stack permitted its pilots to charge more, Murphy could have increased its *tug charges* by a similar amount, thus retaining the competitive price relationship while increasing its revenue. Alternatively, plaintiff could have maintained its charge and benefitted from the additional business attracted by the greater price differential. (R.T. 2405–06, 2410–11)

The logic of that theory, such as it is, rests on the assumption that whatever disadvantage was suffered by plaintiff flowed from the relatively higher pilotage fee of the independent pilots, i. e., Murphy's percentage share of the total package charge was reduced in proportion to the higher share represented by the pilots' fee. The cause of any loss, therefore, would be the differential between the total cost of using Red Stack and the total cost of using plaintiff. But if the independent pilots chose to maintain a level of fees that compelled plaintiff to maintain lower rates to be competitive, the resulting loss of revenue is not attributable to the Red Stack pilots' agreement. Thus, plaintiff has failed to prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See also Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.*, 551 F.2d 790 (10th Cir.), *cert. denied*, 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); *Murphy Tugboat Co. v. Crowley*, 454 F.Supp. 847 (N.D.Cal.1978).

Moreover, plaintiff has failed to offer any evidence from which the jury could have made a reasonable estimate of the amount of profit lost as a result of the agreement. Plaintiff's damage claim here was based on the theory that had the Red Stack pilot fees been increased, resulting in a relative increase in the Red Stack package cost over the cost of using plaintiff's tugs, plaintiff would have increased its revenue through higher rates or more jobs. That theory rests on a number of assumptions, none of which is supported by facts in the record, including the following: that in the absence of the agreement, the Red Stack pilots' fees would have been significantly increased; that had they increased, the independent pilots would not have increased their fees and plaintiff would have been able to increase its ship assist charges above the level of Bay Cities' competitive charges without loss of business; and that if plaintiff had instead maintained its charges unchanged and diverted substantial business, defendants would not have lowered their charges to meet the competition.

In a nutshell, plaintiff's damage theory is premised on a general increase in the price level for ship assist services as a result of which it would have increased its net revenue, either by charging more or by handling a greater volume. It is purely hypothetical, based on assumptions regarding competitive behavior which are wholly unrealistic and without any evidentiary support. *Cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 85-88 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *see also Gray v. Shell Oil Co.*, 469 F.2d 742, 749 (9th Cir. 1972), *cert. denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973) ("'By its own terms, Clayton Act recovery is available only where actual injury has been suffered.'").

But even if all of these objections were overcome, there is no evidence at all from which the jury could have derived the amount of $100,000 as a reasonable estimate of the resultant revenue loss. From all that appears in the record, that figure was simply picked out of the air.[12]

12. Although plaintiff in its brief claims that "the damage calculation for the customer boy-

cott policy and the RSPA Agreement are entirely separate and cumulative," that is not the

For each of the foregoing separate and independent reasons, defendants are entitled to judgment on this claim.

## V. The Conspiracy Charges Under Sections 1 and 2

### A. Capacity to Conspire

The form of verdict submitted to the jury required it to find specifically whether defendants Red Stack, Bay Cities and Crowley Maritime, who had been charged with conspiracy in violation of both Sections 1 and 2, were legally capable of entering into such a conspiracy. The jury failed to reach a verdict on that issue and defendants have moved for judgment.[13]

Bay Cities and Red Stack are corporations which for many years have been substantially owned and controlled by the Crowley family. At some time after 1973, Crowley Maritime, a corporation wholly owned and controlled by the Crowley family, became the holding company for Bay Cities and Red Stack. Thomas Crowley succeeded his father sometime in the 1940's as chief executive officer of the Crowley companies and acted in that capacity during the period in issue. Each of the companies had its own management, but Mr. Crowley had the final authority in decisions affecting rates, equipment purchases, labor matters and operations.

At all material times, Red Stack and Bay Cities followed a common policy of refusing, except in emergencies, to work a vessel together with a competitor's tug. There is sufficient evidence to establish that the policy was discussed among the Crowley companies and was implemented by each in awareness of the fact that the other was doing the same.

Passing for the moment the question whether the Crowley policy constituted an unreasonable restraint of trade, the facts present a classic case of combination and conspiracy, unless the common ownership and control of the companies immunizes them against conspiracy liability.

 The Supreme Court has repeatedly stated that common ownership and control of corporations will not insulate them against antitrust liability. *E. g., United States v. Citizens & Southern National Bank*, 422 U.S. 86, 116–17, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co.*, 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). On the other hand, the mere fact that commonly owned and controlled companies follow common policies does not give rise to antitrust liability. As previously noted, "[a]ntitrust law is concerned with the concerted action of distinct economic entities." *Knutson v. Daily Review, Inc., supra*, 548 F.2d at 802. It is when commonly owned and controlled corporations conduct themselves as distinct economic entities in the market that they become subject to antitrust constraints against concerted action which inhibits that conduct. *Id.* at 802, n. 5 and cases cited. *Cf. Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451 (9th Cir. 1979) (intra-cor-

---

way in which plaintiff's case was presented to the jury. In his summation, counsel for plaintiff did not ask the jury to award damages discretely caused by that agreement. Instead, he treated that agreement as a part of defendants' exclusionary· practices which caused plaintiff to lose jobs and revenue, for which loss he asked for aggregate damages of $669,666. (R.T. 4079–86, 4089–96) Inasmuch as the jury also awarded plaintiff damages for loss caused by defendants' exclusionary practices under Section 2, the instant award of $100,000

would in any case have to be struck as duplicative, requiring a new trial. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 348, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971).

13. The conspiracy claim against Thomas Crowley was previously dismissed on the ground that an officer is legally incapable of conspiring with the corporation by which he is employed. *See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra*, 416 F.2d at 82–83. *See also* Part IV. A. *supra*.

porate conspiracy held not to exist where the decision not to deal with plaintiff was made by a single person, who was the stockholder, president, and chairman of the Board of the affiliated corporations, without participation of any other members of management of the corporations).

The evidence established that Bay Cities and Red Stack historically had separate managements, operated out of separate locations, conducted separate solicitation, used separate and different equipment, negotiated separate and different labor agreements, and charged under separate and different tariffs. As separate corporations, they had the benefits flowing from separate incorporation. They competed for the San Francisco Bay ship assist business, each offering services which differed somewhat in their cost and nature from those offered by the other.[14]

The question presented is whether corporations which are legally separate and conduct themselves as economically distinct entities in the market may escape antitrust liability for concerted action because authority for that action flows from the person exercising common control over both corporations. The Supreme Court's prior expressions seem to reject the existence of an across-the-board defense on that basis. (*See* cases cited at p. 858 *supra*.)

The "distinct economic entity" analysis leads to the conclusion that Section 1 reaches commonly owned firms to the extent that they act as ostensibly separate enterprises in the market. Where, as here, commonly-owned enterprises, enjoying the benefits of separate incorporation, compete for business in the market by offering distinct and independent services, a combination or agreement between them to impose a restraining practice on the market will affect

not only their competitive behavior but, in all likelihood, the competitive behavior of other firms. Thus, market behavior will be adversely affected, and the effect on the market is not diminished by reason of the firms' common ownership.

"The fact that these restraints occur in a setting described by the appellees as a vertically integrated enterprise does not necessarily remove the ban of the Sherman Act. The test of illegality under the Act is the presence or absence of an unreasonable restraint on interstate commerce. Such a restraint may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent. Similarly, any affiliation or integration flowing from an illegal conspiracy cannot insulate the conspirators from the sanctions which Congress has imposed. The corporate interrelationships of the conspirators, in other words, are not determinative of the applicability of the Sherman Act. That statute is aimed at substance rather than form." *United States v. Yellow Cab Co., supra*, 332 U.S. at 227, 67 S.Ct. at 1565.

On the present record, therefore, it cannot be concluded that defendants as a matter of law lacked capacity to conspire.[15]

### B. *Sufficiency of the Evidence*

The existence of legal capacity to conspire does not, however, resolve the question whether a particular combination or agreement of commonly owned or controlled corporations subjects them to Section 1 liability. The Supreme Court has not yet defined the parameters of the so-called intra-corporate conspiracy doctrine. What the cases so far decided establish is that

---

14. Although there is evidence reflecting public awareness that both Bay Cities and Red Stack were "Crowley companies," it is clear that customers dealt with each company separately and that, when it came to doing business with them, they were not regarded as being either unitary or interchangeable.

15. The capacity issue was submitted by the Court to the jury, which apparently encountered great difficulty in dealing with it. On reflection, it seems to the Court to be more of a legal than factual issue (at least where, as here, none of the relevant facts are disputed) and hence more properly resolved by the Court, but there appear to be no reported decisions on this question.

common ownership or control of corporations does not immunize conduct which would otherwise violate Section 1. But common ownership or control of corporations will inevitably bring about communications, understandings, and common actions among them in areas reached by Section 1 such as production, distribution, and price. Indiscriminate application of Section 1 to commonly owned or controlled corporations could therefore have absurd and counterproductive results, subjecting them to liability for "an automatically self-proving conspiracy" on account of activity necessarily arising out of or inherently connected with common ownership or control. *See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., supra,* 416 F.2d at 83–84; Willis and Pitofsky, *Antitrust Consequences of Using Corporate Subsidiaries,* 43 *N.Y.U.L.Rev.,* 20, 29–30 (1968). The result would be the imposition of unreasonable and unwarranted risks and burdens on the routine and legitimate use of the corporate form, and "reduced economic efficiency and a less fluid market for transfer or financing of capital assets." Willis and Pitofsky, *Antitrust Consequences, supra,* 43 *N.Y.U.L.Rev.* at 28; see also Report of the Attorney General's National Committee to Study the Antitrust Laws 34 (1955).

■ Thus, commonly owned or controlled corporations may be held to be guilty of conspiracy under Section 1 only if the evidence shows their agreement or common action to lack a legitimate business purpose and to have an anticompetitive effect. *See DuPont Glore Forgan Inc. v. American Telephone & Telegraph Co.,* 437 F.Supp. 1104, 1115–16 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1367 (2d Cir. 1978); *Chastain v. American Telephone & Telegraph Co.,* 401 F.Supp. 151, 160 (D.D.C.1975). An agreement or common action arising out of or inherently connected with the common ownership or control of the corporations normally would serve a legitimate business

purpose. *See, e. g., Syracuse Broadcasting Corp. v. Newhouse,* 319 F.2d 683, 687 (2d Cir. 1963) (internal redistribution of corporate profits). On the other hand, extraneous restraints producing anticompetitive effects imposed upon commonly owned or controlled corporations holding themselves out to be competitors in the market are evidence from which a jury may find a Section 1 violation.

■ Defendants' policy of refusing to work with competitors falls into the latter category. Such a policy was not an integral aspect or necessary concomitant of common ownership or control. And, as heretofore discussed, the evidence showed that the policy was discussed among members of management of the companies and approved by Mr. Crowley, and was sufficient to permit the jury to infer that each company pursued it with knowledge that it was a common policy of the Crowley companies and for the purpose of implementing it as such. Thus the evidence was sufficient to sustain a Section 1 verdict. *Cf. Theatre Enterprises Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 227, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

Defendants' rates are a different matter. The evidence showed that the rates and tariffs of each company were subject to Mr. Crowley's approval. Crowley consulted with subordinates, and management discussed rates from time to time. Pricing of course is an integral part of the operation of any enterprise and is a legitimate concern of those who own and control it. Nothing is added to the picture by the evidence offered by plaintiff of a single instance in which one of the companies, Bay Cities, circulated a preliminary tariff to Red Stack prior to its implementation. There was no evidence that Bay Cities and Red Stack combined to employ pricing in any anticompetitive fashion.[16]

---

16. Before the trial began, plaintiff pursued the theory that defendants conspired to depress the prices they charged for their services, presumably for the purpose of preventing plaintiff from

operating profitably. The Court rejected this theory as a basis for computing damages, reserving for the trial the question whether defendants' pricing might be evidence of conduct

### C. Unreasonable Restraint of Trade

At the trial the Court rejected plaintiff's contention that defendants' conduct amounted to a per se violation. The policy of refusing to work with competitors did not amount to a boycott because there was no refusal to deal, concerted or otherwise. Cf. *Klor's, Inc. v. Broadway Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Nor is that policy equivalent to a tying arrangement because separate products or services were not involved. Cf. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); L. Sullivan, *Antitrust* 434–40 (1977).

Finally, the price fixing charge was rejected for the reasons stated in the preceding section.

Defendants' joint conduct may, however, (for the reasons stated in Part III. A. 1, *supra*) be found to constitute a misuse of their dominant position in the market, tending to inhibit the free choice of customers seeking tugboat services. The effect of that conduct in tending to foreclose access of competitors to the market is somewhat analogous to that of exclusive dealing contracts imposed by the dominant firm in the market. Cf. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 329, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). And from the point of view of economic efficiency, defendants' refusal to work policy artificially reenforces demand for their tugboat services, tending to lead to underutilization of the facilities of competitors.

These considerations, coupled with the fact that the Crowley companies followed a refusal to work policy only in the market where they held a dominant position, would have permitted the jury to find a combination in unreasonable restraint of trade.

Defendants, therefore, are not entitled to judgment as a matter of law on the Section 1 claim. Inasmuch as the same conduct has heretofore been held to be sufficient to permit the jury to find a violation of Section 2, defendants are not entitled to judgment as a matter of law on the conspiracy to monopolize issue.

### VI. Damages [17]

We come then to the question whether the jury's award of damages aggregating $600,000 for violations of Section 2 can stand.[18]

---

violating Section 1 or 2. *Murphy Tugboat Co. v. Crowley, supra,* 454 F.Supp. at 850. Plaintiff produced no evidence at the trial, however, from which a jury could find that defendants acted jointly to depress prices. The only evidence offered in this respect—reflecting a relative increase in the labor to revenue ratio maintained by Bay Cities and Red Stack from time to time—raised no inference of joint action to maintain depressed prices. Moreover, the substantive evidence disclosed that the prices charged by both Red Stack and Bay Cities, which differed from each other, exceeded average variable costs, exceeded the prices charged by plaintiff, and generally even produced a net profit. The Court therefore instructed the jury that these prices were lawful and could not be considered in arriving at a verdict for plaintiff under Section 1 or 2. The Court adheres to that view and further discussion of pricing under either Section 1 or 2 is therefore unnecessary. *See Janich Bros. Inc. v. American Distilling Co., supra,* 570 F.2d 848.

17. As stated in note 16 *supra,* plaintiff's original theory of damages was premised on the existence of a conspiracy among defendants to depress the charges for ship assist services.

Damages consisting of lost profits were sought on the theory that, but for defendants' conspiracy, their charges would have been higher, allowing plaintiff to increase its charges and thereby increase its revenue without additional expense. In a prior ruling, the Court rejected plaintiff's offer of proof based on this theory. *Murphy Tugboat Co. v. Crowley, supra,* 454 F.Supp. 847.

18. For purposes of deciding the damage issue on the motion for judgment n. o. v., the Court will adopt plaintiff's interpretation of the verdict (Exh. A, attached) that the jury assessed $600,000 against defendants jointly and severally, and that the assessment of particular amounts to specific defendants was surplusage.

In the event the judgment were overturned on that issue, however, the verdict must properly be treated as imposing on each defendant liability for a specified amount of damages. The form of verdict specifically asked the jury to find and state separately the amount of damage caused by each defendant found to be liable. The terms of the verdict form cannot be ignored. Cf. Fed.R.Civ.P. 49(b) (in case of inconsistency between a general verdict and the

· The Court has heretofore determined that, on the record before it, the jury was entitled to find that defendants' policy of refusing to work with competitors was unlawful and had an adverse impact on plaintiff. (*See* Part III. A. 1, *supra*.) Plaintiff correctly points out that once it established "with reasonable probability the existence of some causal connection between defendant's wrongful act and some loss of anticipated revenue . . . the jury will be permitted to 'make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.' *Bigelow v. RKO Radio Pictures, Inc.*, [327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946)]." *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 392 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). *Accord, Kapp v. National Football League*, 586 F.2d 644 (9th Cir. 1978); *Greyhound Computer Corp. v. International Business Machines, supra*, 559 F.2d at 506; *Knutson v. Daily Review, Inc., supra*, 548 F.2d at 811–12. Defendants' argument that any resulting injury suffered by plaintiff was not cognizable under the antitrust laws must therefore be rejected.

The issue before the Court is whether plaintiff offered evidence sufficient to enable the jury to make such a just and reasonable estimate. That mathematical certainty is not required for proof of damages is of course well settled, *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563–66, 51 S.Ct. 248, 75 L.Ed. 544 (1931), but that is not the issue here. As the Court observed in *Story Parchment*:

"The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages *which are definitely attributable to the wrong* and only uncertain in respect of their amount." *Id.* at 562, 51 S.Ct. at 250 (emphasis added). And in *Bigelow v. RKO Radio Pictures, Inc., supra*, 327 U.S. at 264, 66 S.Ct. at 579–80, the Court said that:

"[I]n the absence of more precise proof, the jury could conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, *and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes,* that defendants' wrongful acts had caused damage to the plaintiffs. . . . [T]he jury could return a verdict for the plaintiffs, even though damages could not be measured with the exactness which would otherwise have been possible. . . . In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not *render a verdict based on speculation or guesswork.* But the jury may make a just and reasonable estimate of the damage based on relevant data . . . ." (Emphasis added) *See also Zenith Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

 While a "plaintiff need not negative all possible alternative explanations for his decline in profits," *Knutson v. Daily Review, Inc., supra*, 548 F.2d at 811, there

jury's answers to special interrogatories, the latter control). The assessments of $180,000 each against Thomas Crowley and Crowley Maritime must then be set aside for the reasons stated in Part III. B., *supra*. There would remain assessments of $160,000 and $80,000 against Red Stack and Bay Cities, respectively. Inasmuch as each may be separately liable for monopolization and attempt to monopolize, the jury could properly find each to be responsible for a different amount of damage.

This holding does not conflict with the common law principle that a jury has no right to apportion damages among joint tortfeasors, and that if it does, the total damage award will control and the attempted apportionment will

be treated as surplusage. *See Gates v. L. G. DeWitt, Inc.*, 528 F.2d 405, 413 (5th Cir. 1976) (applying state common law); *Dauenhauer v. Sullivan*, 215 Cal.App.2d 231, 30 Cal.Rptr. 71, 74 (1963); Annot., 46 A.L.R.3d 801, 830–35 (1972). In those cases, the jury acted on its own in deciding to apportion damages after first determining a lump sum damage award. Here, however, the jury acted in accordance with the Court's instruction that it first assess the damage caused by *each* defendant and then total these amounts. Plaintiff did not object to this form of verdict at the time of trial. It cannot now contend that the jury actually meant to award $600,000 jointly and severally against defendants.

must be proof of some damage "flowing from the unlawful conspiracy." *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. at 114 n. 9, 89 S.Ct. 1562. Causation, while relevant in the first instance to proof of the fact of damages, has a bearing as well on the sufficiency of the proof of the amount of damage. Unless the amount sought to be recovered is shown to be "definitely attributable" to defendant's wrongful conduct, there is no basis for making a "just and reasonable estimate." [19]

█ To meet the minimum requirement of proof in a market exclusion case in which lost profits are sought, plaintiff must normally produce evidence falling into one of the following categories:

(1) Comparison of plaintiff's performance before and after the wrongful conduct under otherwise similar conditions; *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 376–78, 47 S.Ct. 400, 71 L.Ed. 684 (1927); *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.,* 526 F.2d 1196, 1206–07 (9th Cir. 1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976);

(2) Comparison of performance in restrained and unrestrained markets which are otherwise comparable; *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129; *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; *Richfield Oil Corp. v. Karseal Corp.,* 271 F.2d 709, 714–15 (9th Cir. 1959), *cert. denied,* 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960); or

(3) Loss of specific business or customers; *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 913 (2nd Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1131, 8 L.Ed.2d 85 (1962).

Plaintiff offered no "before and after" evidence, nor did it offer evidence of loss of particular sales. Instead, it relied on damage theories which are discussed in the following sections.[20]

---

**19.** The cases cited by plaintiff confirm the necessity of proof sufficient to permit a reasonable inference that the loss or damage was attributable to acts of defendants. In *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), where plaintiff, a distributor, complained of having been illegally cut off by defendant, its supplier, plaintiff's damage proof was based on a comparison with revenue it had received during the period prior to the cutoff. In *Story Parchment Co. v. Paterson Parchment Paper Co., supra,* 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544, where plaintiff complained of predatory price cuts, the proof was based on comparison of the prices previously charged with the unlawfully cut prices, allowing the jury to compute damages based on the differential. In *Bigelow v. RKO Radio Pictures, Inc., supra,* 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, where plaintiff complained of having been deprived of first run motion pictures, the proof was based on comparison with the profits received by defendants' comparable theatre and also with the earnings of plaintiff's theatre during a prior period when it had received some first runs. And in *Zenith Radio Corp. v. Hazeltine Research, Inc., supra,* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129, where plaintiff complained of having been excluded from the Canadian market for television sets and radios by an illegal patent pool, plaintiff's damage proof was based on its share in the comparable United States market and its ability to obtain the same share in Canada had its marketing not been impeded by defendant's conspiracy to deny it patent licenses. *Id.* at 116 n. 11, 123–25, 89 S.Ct. 1562. These decisions do not support plaintiff's contention that its operating losses constitute proof of the amount of damage attributable to defendants' wrongful conduct simply because that conduct precluded it from obtaining substantial additional business which it could have handled profitably.

**20.** Plaintiff's damage theories have undergone several metamorphoses and no useful purpose would be served by recapitulating their evolution. At oral argument on these motions, the Court expressed its concerns on the damage issue and invited counsel to submit further memoranda setting out the theory and the substance of the supporting evidence. The following discussion then addresses plaintiff's position as most recently taken in its post-argument memorandum.

Regrettably, plaintiff chose not to respond to the Court's specific request at oral argument to address in its memorandum its theory of damages under the Red Stack pilots' agreement. The Court in this opinion has therefore had to rely on the arguments and theories previously urged by plaintiff on this aspect of the case.

## A. Lost Past Profits

Plaintiff contends that had it not been for defendants' refusal to work policy it would have had the same share of jobs on vessels over 14,000 tons as it had of jobs on vessels of less than 14,000 tons. It handled 28 percent of the small vessel jobs but only 2 percent of the large vessel jobs. (Exh. 606) Thus, its volume of work on large vessels would have substantially increased.

Next ·plaintiff contends that it would have adopted a Red Stack-type grid tariff under which charges would have increased with the size of the vessel, but at a level of approximately 80 percent of the corresponding Red Stack charge.

Finally, relying on testimony of its economist Professor McFadden, plaintiff contends that given the additional volume at the higher rates, it would have realized net profits on the business which would have eliminated its operating losses and caused it to break even.[21]

■ The threshold problem with this damage theory is the assumption that plaintiff's operating losses incurred in serving the small vessel segment of the market represent the amount of damage attributable to exclusion from the large vessel segment. Even assuming that plaintiff would have realized a net profit from working large vessels, the amount of that profit is not a function of the amount of loss suffered working small vessels. That loss logically cannot be said to be attributable to anything other than the small vessel operation. The fact that plaintiff might have realized from large vessel jobs profits to compensate for the losses incurred on small vessel jobs does not make the latter a measure of the former.

■ The mere fact that defendants' conduct had an adverse impact on plaintiff's business and that this business showed a loss does not provide a basis for equating that loss with the amount of damage caused by defendants. Plaintiff must prove—albeit not with mathematical certainty—"injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra,* 429 U.S. at 489, 97 S.Ct. at 697. Professor McFadden's opinion, unsupported by facts, that but for defendants' conduct plaintiff would not have suffered losses does not convert the evidence of operating losses into evidence of damage flowing from defendants' antitrust violations. *See Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 566 (2nd Cir. 1970); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 457 F.Supp. 404, 420–21 (S.D.N.Y.1978).[22]

---

**21.** In his closing argument to the jury, plaintiff's counsel put it as follows:

"Now what kind of losses did we have? These losses on this chart are the losses from all operations for four years. And this is from Mr. Murphy's testimony, when he referred to his income tax returns, and this is the figure: $306,217. Those were our actual losses. And those are the losses that Professor McFadden testified that had we been operating in a competitive market where we had not been excluded, where we had free access to the big ships and the flat tows, those are the losses we would not have had." (R.T. 4093).

**22.** Such evidence as there was refuted, rather than supported, the claim that plaintiff's tax losses provided a basis for a just and reasonable estimate of its antitrust losses. The evidence showed, for example, that plaintiff operated at a profit during its first year, when defendants' practices were the same as later, but that this profit was converted to a loss in subsequent years when plaintiff (1) increased officers' salaries substantially, e. g., Murphy's own salary went from $11,000 in 1971 to a high of $61,000 in 1975, at a time when operating results were the lowest (R.T. 640–42, 3451, 3511–12); (2) paid $9700 for a speedboat which produced only $600 of revenue and was used mainly for Mr. Murphy's pleasure (R.T. 770–73); (3) acquired an underpowered tug, the San Clemente, which, according to an application for a Small Business Administration loan, was "a terrific drain on the company," (R.T. 786, Exh. G3); and (4) paid $1000 for a coffee table which Mr. Murphy used in his home (R.T. 775–76; Exh. V). Finally, defendants' accountant showed that plaintiff incurred a two-year loss of $28,100 in its ship assist operations in Sacramento, where defendants did not operate and their practices therefore had no effect (R.T. 3440, 3460). Mr. Murphy's less detailed calculations showed that the Sacramento operation earned $4100 during these two years (R.T. 3869), but his testimony suggested that it suffered a loss instead. While these would normally of course be matters for the jury to

Even if we were to put aside this fatal defect, there are other flaws in the damage theory which are so obvious and substantial as to render it pure speculation.

First, the assumption that plaintiff would have acquired something on the order of a 28 percent share of the large vessel segment of the market, when all it ever had was a two percent share, is totally without evidentiary support. The evidence showed that there are substantial differences between docking and undocking small and large vessels. Docking large vessels is more hazardous and difficult, involves greater risks, and generally requires more, and more powerful, tugs. (R.T. 514, 523, 567, 893–94, 1348, 2222.) Moreover, plaintiff's participation in this work was necessarily premised on its working jointly with Red Stack on particular vessels. Although a number of witnesses testified in favor of having the option of calling on both Murphy and Red Stack, the evidence also indicated that some pilots and vessel operators prefer to avoid the risks of divided responsibility and liability. Thus, plaintiff's straight extrapolation from its share of small vessel jobs to project its share of large vessel jobs is too speculative to be accepted. Moreover, the possibility that plaintiff, operating most of the time with only one large tug,[23] could with Red Stack's help have captured more than one-fourth of the large vessel market from Red Stack, operating eight large tugs, is too remote and speculative to permit the jury to consider it as a basis for damages.[24]

Second, the assumption that plaintiff would have published a grid tariff with a different and substantially higher rate structure is purely hypothetical. There is no evidence that plaintiff was precluded from publishing such a tariff while it was in business. And certainly the assumption that plaintiff could have maintained a level of rates 20 percent below Red Stack's while taking away, on the strength of Red Stack's cooperation, a large share of Red Stack's business defies reason.

Third, plaintiff's conclusion that with 28 percent of the large vessel segment serviced at 80 percent of the Red Stack rates it would have generated a profit equal to the amount it lost while servicing the small vessel segment is pure speculation. Even

weigh, they are relevant to the legal issue whether the proof offered of operating losses could qualify as the basis for a just and reasonable estimate of damages by the jury.

**23.** *See* note 5 *supra.*

**24.** A further difficulty with extrapolation from plaintiff's 28 percent share of the small vessel jobs is that this share resulted in part from plaintiff's exclusion from the large vessel jobs. Defendants' practice inevitably forced plaintiff to concentrate on small vessels, leading to a penetration of that market segment greater than it would have been had plaintiff spread its limited resources over both small and large vessel jobs. Thus, plaintiff, by relying on the 28 percent figure, is in a sense seeking to profit from defendants' wrong, something it should not be permitted to do. *See Eastman Kodak Co. v. Southern Photo Materials Co., supra,* 273 U.S. at 378, 47 S.Ct. 400.

A related difficulty concerns the effect on plaintiff's share of small vessel jobs had it acquired the 28 percent share of large vessel jobs. Plaintiff's position on this question has vacillated. This of course is not a case where plaintiff had a proven capacity to handle additional volumes of business. Nor is this a case where plaintiff proposed to acquire additional equipment, intending instead to rely on the availability of defendants' equipment to augment its own capacity.

Professor McFadden's prediction in this regard that plaintiff could have greatly expanded its volume with its existing fleet of tugs (*see* note 5 *supra* ) depended on his assumption that each of plaintiff's tugs had a capacity of 2.9 jobs per day, and that plaintiff had not been working at its full capacity. (R.T. 2257–62) However, this capacity figure is speculative and is based only on Mr. Murphy's observation that during a five-month period, one of his tugs, the Go Getter, averaged 2.9 jobs per day. (R.T. 2104–05) There are serious problems with plaintiff's approach of taking the total number of jobs done, dividing by the number of workdays, and then assuming that this is the capacity of each tug for purposes of calculating damages: Red Stack did not operate at this 2.9 figure, although there is no reason to assume it was less efficient than Murphy; the 2.9 figure does not take into account the need to have standby capacity to handle periods of peak demand; and it is speculative to assume that each Murphy tug, no matter what size or in what condition, would have the same capacity as the Go Getter, a large tug which alone operated continuously for 3½ years. (R.T. 2467–85, 2509–14)

accepting the contention that plaintiff could have performed additional jobs on which its revenue would have exceeded its costs, there are no computations in the record to support the particular numbers which plaintiff placed before the jury and the jury accepted.

It may well be that defendants' policy caused plaintiff to lose some jobs which it otherwise might have handled. But from all the record discloses, plaintiff made no effort to offer evidence reflecting the impact of defendants' policy on its business. Presumably, that approach would have generated figures far more modest than those placed before the jury. That fact, however, does not justify permitting the jury to base a verdict on theories and assertions that are wholly speculative and without evidentiary support.

### B. Lost Future Profits

Plaintiff also sought damages for the loss of future profits based on its prior years' revenues. In closing argument, plaintiff's counsel stated the theory of recovery to the jury as follows:

"Now how do we figure out what would have happened to us in the future? I think it is a pretty simple matter. We would stay in business. We would continue to operate, and operate profitably. The only question is: how profitably?

"We think that it is reasonable for you to conclude that we would have operated on about the same, at least as well as Bay Cities did in its worst year of this three-year period, the least of the Bay Cities and Red Stack performance for the entire three-year period, and that is that we would have earned something in the vicinity of 82% [sic, 8.2%] of our revenue as profit. That is what they earned. That is what can be earned in this business. There is no reason why we could not earn it.

"So the calculation is thus: The first thing that you have to do is you have to figure what would our revenue have been. We have assumed for the purpose of this future analysis that our revenue would have been our same annual revenue that we had for the four years that we operated. And our annual revenue at that time was $435,000; $435,928. And if you take 8.2 percent of that, you get $35,746. That's annually.

"We think that it is reasonable for you to conclude that if we had been in business five years beyond the date that we got driven out, and to give us credit after this year, after we had this going-out-of-business loss, beyond that year, for the years '77, '78, '79, '80, and '81, a five-year period, that's $178,730.

"So I submit to you that our total losses are $178,730 for the future profits, and for the lost profits, $490,936, or total losses in this amount: $669,666." (R.T. 4095–96)

There is no evidence to support the assertion that plaintiff could have earned a profit of 8.2 percent of gross revenue or that this would have been its profit rate in the absence of defendants' conduct. Even assuming that Bay Cities' operation was in certain respects comparable, the fact that Bay Cities was able to operate profitably in the small vessel segment of the market and plaintiff (after the first year) was not, renders any reference to Bay Cities' profit rate entirely inappropriate.[25] Plaintiff's claim for future profits must be rejected as wholly speculative. See Lessig v. Tidewater Oil Co., 327 F.2d 459, 473–74 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964).

The Court is therefore compelled to conclude that the damage verdict is too speculative to stand. See Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,

---

**25.** Bay Cities' financial statements, from which plaintiff derived the 8.2 percent figure, were received into the record in connection with plaintiff's sales below cost claim. There was no suggestion when they were offered that they would be used as a basis for making a comparison to support the claim for future profits, advanced for the first time in closing argument. This use, without adequate foundation that Bay Cities' business was comparable to plaintiff's, would in any event require granting a new trial on damages.

*supra*, 416 F.2d at 88; *Volasco Products Co. v. Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 390–93 (6th Cir. 1962), *cert. denied*, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963). The words of the Ninth Circuit are appropriate here:

> "The verdict of a jury should not lightly be set aside—certainly not for the mere reason that a court may disagree with it. However, in this case we are convinced that this verdict for the plaintiff, if allowed to stand, would be a legally unjustified windfall to the plaintiff and a miscarriage of justice." *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, *supra*, 567 F.2d at 915.[26]

### VII. *Motion For New Trial*

The Court may grant defendants' motion for a new trial conditionally, even if the verdict is supported by substantial evidence, if the verdict is contrary to the clear weight of the evidence or results in a miscarriage of justice. *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). In this case, defendants' motion for a new trial must be granted, conditioned on reversal of the judgment, in the following respects:

### A. *Damages Under Section 2*

For the reasons discussed in Parts IV. C. and VI, *supra*, the damage award is not supported by substantial evidence and is in any event excessive and against the clear weight of the evidence. A new trial, limited to the issue of damages, must therefore be granted. *Hanson v. Shell Oil Co., supra*, 541 F.2d at 1360; *Minthorne v. Seeburg Corp.*, 397 F.2d 237, 244 (9th Cir. 1968).

**26.** The confusion engendered in the jury's mind by plaintiff's "damage proof" is confirmed by the verdict. In the closing argument counsel for plaintiff stated that "our total losses are . . . in this amount, $669,666," and went on:

> "And that is what we firmly feel that these defendants damaged Murphy Tug, in that amount. And that is what we ask you to award as your verdict." (R.T. 4096)

### B. *Liability of Thomas B. Crowley and Crowley Maritime Corporation*

For the reasons discussed in Parts III. B. 1 and 2, *supra*, the verdicts against Thomas Crowley and Crowley Maritime must be set aside as being against the clear weight of the evidence. There was no evidence permitting the jury to find either a sufficient degree of active participation or wrongful conduct or a sufficient causal connection with damage suffered by plaintiff.

### C. *Liability of Red Stack on Account of the Red Stack Pilots' Agreement*

For the reasons discussed in Part IV, *supra*, the verdict against Red Stack based on the pilots' agreement is against the clear weight of the evidence, and the damage award is excessive. A new trial must be granted on that issue.

### D. *Liability for Conspiracy (other than the Red Stack Pilots' Agreement).*

Because plaintiff presented no separate damage claim under Section 1, the Court's disposition of the Section 2 claim on damage grounds disposes of this claim as well. In the event the judgment is reversed, however, and a new trial is ordered, plaintiff will be entitled to a new trial on the conspiracy issue. (*See* Part V, *supra*)

In all other respects, defendants' motion for a new trial is denied.

### CONCLUSION

For the reasons stated, defendants' motion for judgment notwithstanding the verdict is granted. In the alternative, defendants' motion for a new trial is granted to the extent stated above, conditional on reversal of the judgment. Each party shall bear its own costs.

IT IS SO ORDERED.

With no other relevant evidence before it, the jury awarded an aggregate of $700,000, assessing different amounts for which there is no apparent basis against Bay Cities, Red Stack, Crowley Maritime and Thomas B. Crowley on the Section 2 claim and Red Stack on the Red Stack pilots' agreement claim.

868

## EXHIBIT A

### VERDICT

We the jury, unanimously find

A. On plaintiff's claim under Section 1 of the Sherman Act:

1. Were the defendants Shipowners & Merchants Towboat Co., Bay Cities Transportation Co., and Crowley Maritime Corp. capable of entering into an unlawful conspiracy?

 Yes _____
 No _____

2. (If the answer to # A.1 is yes) Did defendants engage in one of the conspiracies in restraint of trade in violation of Section 1 referred to below?

 Yes _____
 No _____

3. (If the answer to # A.1 and # A.2 is yes) Did defendants engage in a conspiracy in restraint of trade in violation of Section 1?

 a. To exclude plaintiff from shipwork on the Bay?

 Yes _____
 No _____

 b. To exchange price information concerning tugboat services?

 Yes _____
 No _____

4. (If the answer to # A.3a or # A.3b is yes) Was the conspiracy a proximate cause of damage to plaintiff's business or property?

 Yes _____
 No _____

5. (If the answer to # A.4 is yes) State the amount of damage you find to have been proximately caused to plaintiff by each defendant you find to have violated Section 1:

 Shipowners: $_____
 Bay Cities: $_____
 Crowley Maritime: $_____
 Total Damages Awarded: $_____

6. a. Was the agreement between Shipowners and the Red Stack Pilots Association one that was intimately related to the wages or working conditions of the members of the Association or employees of Shipowners?

 Yes _____
 No ___X___

 b. (If the answer to # A.6a is no) Was the agreement in # A.6a an unreasonable restraint of trade?

 Yes ___X___
 No _____

 c. (If the answer to # A.6b is yes) Was the agreement a proximate cause of damage to plaintiff's business or property?

 Yes ___X___
 No _____

d. (If the answer to # A.6c is yes) State the amount of damage you find to have been proximately caused to plaintiff as a result of the agreement.

 $___100,000.00___

B. On plaintiff's claim under Section 2 of the Sherman Act:

1. Did defendants monopolize trade or commerce in violation of Section 2?

 Yes ___X___
 No _____

2. Did defendants attempt to monopolize trade or commerce in violation of Section 2?

 Yes ___X___
 No _____

3. (If the answer to # A.1, above, is yes) Did defendants conspire to monopolize trade or commerce in violation of Section 2?

 Yes _____
 No _____

4. (If the answer to # B.1 or # B.2 or # B.3 is yes) Was the violation by defendants of Section 2 a proximate cause of damage to plaintiff's business or property?

 Yes ___X___
 No _____

5. (If the answer to # B.4 is yes) State the amount of damage you find to have been proximately caused to plaintiff by each defendant you find to have violated Section 2:

 Shipowners $___160,000.00___
 Bay Cities $___80,000.00___
 Crowley Maritime $___180,000.00___
 Thomas B. Crowley $___180,000.00___
 Total Damages Awarded $___600,000.00___

C. On plaintiff's claim under the California Unfair Practices Act:

1. Did defendants make secret payments in violation of Section 17045?

 Yes ___X___
 No _____

2. (If the answer to # C.1 is yes) Was defendants' violation of Section 17045 a proximate cause of damage to plaintiff's business or property?

 Yes _____
 No ___X___

3. (If the answer to # C.2 is yes) State the amount of damage you find to have been proximately caused to plaintiff by each defendant you find to have violated Section 17045:

 Shipowners $_____
 Bay Cities $_____
 Crowley Maritime $_____
 Thomas B. Crowley $_____
 Total Damages Awarded $_____

D. On counterclaimants' claim under the California Unfair Practices Act:

1. Did counterdefendant make secret payments in violation of Section 17045?

 Yes X 
 No _____

2. (If the answer to # D.1 is yes) Was counterdefendant's violation of Section 17045 a proximate cause of damage to counterclaimant's business or property?

 Yes _____
 No X 

3. (If the answer to # D.2 is yes) State the amount of damage you find to have been proximately caused to counterclaimants by counterdefendants' violation of Section 17045:

 Murphy Tugboat $_____
 Roger Murphy $_____
 Total Damages Awarded $_____

DATE: 8/21/78

/s/ Marie Van Arsdale
FOREPERSON