[No. B136095. Second Dist., Div. Five. Mar. 14, 2000.]

PMC, INC., et al., Plaintiffs and Appellants, v.
NEIL KADISHA et al., Defendants and Respondents.

1370

**COUNSEL**

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Louis R. Miller and Sean Riley for Plaintiffs and Appellants.

Littler Mendelson, Robert F. Millman, Douglas A. Wickham and Scott M. Lidman for Defendants and Respondents.

---

## OPINION

## TURNER, P. J.—

### INTRODUCTION

Plaintiffs, PMC, Inc., and Winkler Forming, Inc. (WFI), appeal from a summary judgment in favor of defendants Neil Kadisha, Benjamin Nazarian, Parviz Nazarian, and Pioneer Private Equity Fund LLC (Pioneer). The question presented is whether, as shareholders, officers and directors of a corporation, defendants can be held personally liable for misappropriation of trade secrets, unfair competition, or interference with prospective economic advantage. We hold that a corporate officer or director may be liable for an intentional tort if: (1) the officer or director purchased or invested in the corporation the principal assets of which were the result of unlawful conduct; (2) the officer or director took control of the corporation and appointed personnel to run the corporation, which was engaging in unlawful conduct; and (3) the officer or director did so with knowledge or, with respect to trade secret misappropriation, when she or he had reason to know, of the unlawful conduct. We find plaintiffs have raised a triable issue of material fact as to the individual defendants' active meaningful participation in, consent to, or approval of, the tortious conduct. Accordingly, we reverse the judgment.

### STANDARD OF REVIEW

██ A summary judgment motion is directed to the issues framed by the pleadings. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 [32 Cal.Rptr.2d 223, 876 P.2d 1022]; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207].) A party may move for summary judgment "if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a).) Summary judgment is granted when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) A defendant proves a claim has no merit if he or she establishes one or more of the elements of the cause of action cannot be separately established. (Code Civ. Proc., § 437c, subd. (n)(1); *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300,

1304 [85 Cal.Rptr.2d 768].) The following is a moving defendant's burden of proof: "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists, but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2); see *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 72 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) ■ We review the trial court's decision to grant the summary judgment de novo. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 [59 Cal.Rptr.2d 20, 926 P.2d 1114]; *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 929 [30 Cal.Rptr.2d 440, 873 P.2d 613].)

### THE SUMMARY JUDGMENT MOTION

Plaintiffs allege that Paul Winkler, a codefendant who is not a party to the present appeal, and others misappropriated corporate assets and trade secrets of WFI, their former employer, and used the misappropriated knowledge in a new competing business, Paul Winkler Plastics Corporation (PWP). PMC, Inc., is the majority shareholder of WFI. Parviz Nazarian and Benjamin Nazarian are father and son.[1] Neil Kadisha is Parviz Nazarian's son-in-law. Pioneer is the individual defendants' investment vehicle. Their interests in Pioneer are as follows: Mr. Kadisha—40 percent; Benjamin Nazarian—20 percent; and Parviz Nazarian (as general partner of Union Communications Company)—40 percent.

The codefendants, Paul Winkler, Christopher Winkler, Colin Winkler,[2] Craig Snedden, James Longstreth, Dean Brown, and John Bussey, were former WFI managers who joined PWP. Their positions with WFI were as follows: Paul Winkler, president; Christopher Winkler, director of sales; Colin Winkler, director of purchasing and scheduling; Mr. Snedden, vice-president of sales; Mr. Longstreth, vice-president of manufacturing; Mr. Brown, tooling department manager; and Mr. Bussey, responsible for management information systems and creation of computer codes and software that control machinery used in the manufacturing process. The codefendants are not parties to the present appeal. Both WFI and PWP are in the business of manufacturing plastic food containers.

---

[1]For purposes of clarity, we shall refer to the Nazarians by their first and last names.

[2]To avoid confusion, we will refer to the Winklers by their first and last names.

Plaintiffs also allege the codefendants had, inter alia, "contacted major customers of WFI to solicit business based upon providing the same products [then] manufactured by WFI; taken with them WFI's confidential new and prospective customer lists, customer product specifications, and proprietary information, thereby allowing them to duplicate [WFI's] manufacturing processes; solicited key WFI employees to leave WFI's employ; and disparaged WFI to existing customers." After the initial misappropriation and other tortious conduct had allegedly occurred, and after plaintiffs filed this lawsuit against the codefendants, the present defendants invested in and became officers and directors of PWP. The individual defendants' initial $1.25 million investment in PWP through Pioneer was paid by them in proportion to their interests in Pioneer. Plaintiffs demanded in writing that defendants cease and desist from the ongoing use of WFI's confidential and proprietary information. Plaintiffs then amended their complaint to include the present defendants. Plaintiffs alleged defendants had, with knowledge or reason to know of the codefendants' prior wrongful conduct, refused to cease using the stolen assets and participated in, financed, directed, and authorized the ongoing illegal acts. ▬ █ ▬▬ Plaintiffs sought to hold defendants personally liable on causes of action for misappropriation of trade secrets, unfair competition,[3] interference with prospective economic advantage, and "conspiracy."[4]

In their summary judgment motion, defendants asserted as a complete defense that they could not be held personally liable for their codefendants' misappropriation of WFI's trade secrets or other tortious conduct. In support of their summary judgment motion, the individual defendants filed declarations stating that at no time had they authorized or directed any PWP officer or employee to engage in any wrongful or unlawful activity, including the conduct alleged in plaintiffs' third amended complaint. Further, following receipt of a cease and desist demand from plaintiffs' counsel, defendants had investigated whether PWP was conducting business using any alleged trade

---

[3]The Supreme Court has recently defined "unfair" competition in the sense of anticompetitive practices as meaning "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 187 [83 Cal.Rptr.2d 548, 973 P.2d 527], fn. omitted; see *South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 877, fn. 9 [85 Cal.Rptr.2d 301].)

[4]"Conspiracy" is not a cause of action per se. (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 786-787 & fn. 4 [157 Cal.Rptr. 392, 598 P.2d 45].) However, the Supreme Court has held: "Personal liability, if otherwise justified, may rest upon a 'conspiracy' among the officers and directors to injure third parties through the corporation. [Citations.]" (*Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 785; *Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 48 [260 Cal.Rptr. 183, 775 P.2d 508]; *Golden v. Anderson* (1967) 256 Cal.App.2d 714, 719-720 [64 Cal.Rptr. 404].)

secrets or other property of WFI. Based on information provided to them, including an expert's opinion, defendants found PWP was not engaged in any continuing wrongdoing. The evidence in support of the summary judgment motion was sufficient to shift the burden to plaintiffs. (Code Civ. Proc.; § 437c, subd. (o)(2); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 749-751 [41 Cal.Rptr.2d 719]; *Union Bank v. Superior Court, supra,* 31 Cal.App.4th at p. 593.)

Plaintiffs contended a triable issue of material fact remained whether defendants had themselves personally engaged in tortious conduct. Plaintiffs argued defendants were subject to personal liability because of the following combined factors: defendants invested in PWP; defendants became majority shareholders, officers, and directors of PWP; defendants effectively took control of the corporation; defendants appointed personnel to run the corporation; and defendants knew or had reason to know that their codefendants had improperly acquired and were using WFI's trade secrets to compete with their former employer, had engaged in acts of unfair competition, and were interfering with WFI's prospective economic advantage.

Plaintiffs presented evidence defendants knew, before they invested in PWP, that: the codefendants had at first sought to buy WFI out at a cost of $27 million and later $40 million; there was a third party offer to purchase WFI for $58 million; PWP was not a usual start-up venture but a continuation or replication of WFI; for an investment of approximately $1.5 million defendants could own a company that would be an "exact replicate of WFI"; PWP was headed by the former WFI management team; the codefendants expected to be producing and selling products in a very short time, within one month; the codefendants had solicited and received $12 million in sales commitments from WFI customers; WFI had developed hundreds of molds and mold inserts worth millions of dollars; the codefendants had used WFI computer specifications to develop PWP products; these products were virtually identical to those of WFI; the codefendants had hired away key WFI personnel with the expertise and knowledge to manufacture the products; they had diverted to PWP equipment originally ordered by WFI; they were being sued by WFI in "a fifty (50) million dollar lawsuit" for misappropriation of trade secrets and unfair competition; and a preliminary injunction had been issued in that lawsuit.[5] Further, defendants never discussed with Paul Winkler whether he was using any WFI information at PWP.

---

[5] The trial court issued a preliminary injunction on September 2, 1998, enjoining the codefendants from making any use, directly or indirectly, of specified WFI data and information including: computer data, drawings, or blueprints containing product specifications; tooling design specifications; product cost information; and financial information. In May 1999, plaintiffs were denied further injunctive relief with respect to "next generation production technology" allegedly developed by the codefendants while they were WFI employees.

In August 1998, Paul Winkler testified at a deposition that he had taken from WFI a computer disk containing specifications for molds and inserts. All of the molds and inserts were for WFI's products. Further, Paul Winkler admitted he had taken a computer disk containing confidential WFI financial information. A transcript of Mr. Winkler's deposition testimony was given to or was available to the defendants.

In November 1998, after conducting a due diligence investigation, defendants made an initial investment of $1.25 million in PWP in return for a 50 percent ownership interest and control of three of five seats on the board of directors. Under the stock purchase agreement, the written approval of at least one of the individual defendants, who are the parties to this appeal, was required for any expenditure by PWP of $100,000 or more. PWP agreed to indemnify defendants in connection with this lawsuit.

The three individual defendants were appointed directors of PWP. In November 1998, Benjamin Nazarian was also named chief financial officer, secretary, and general counsel of PWP. At that time, Paul Winkler served as president and chief executive officer of the corporation. In January 1999, defendants appointed a long-time business associate, Ira Maroofian, president and chief executive officer of PWP. In February 1999, Benjamin Nazarian was elected chairman of the board of directors. In April 1999, Mr. Maroofian became the corporation's chief financial officer as well. Over time, defendants' investment in PWP increased to over $3 million.

In January or February 1999, defendants received further evidence as follows: the codefendants, while still employed by WFI, had developed a plan to start a competing business producing plastic food containers; the codefendants intended to manufacture products for WFI's existing customers; the codefendants had duplicated and stored at WFI inserts used to produce all its products; the codefendants stored this material while they were still employed at WFI; these duplicated and stored inserts were intended to be used for production of PWP products; the duplication was done at the "off-the-book" expense of WFI's parent corporation, PMC, Inc., at a cost of hundreds of thousands of dollars; the codefendants planned to use the stolen inserts to compete with WFI; Mr. Brown, the head of WFI's tooling department, had worked at home on tooling designs (including molds, beds, and inserts) for PWP using WFI software and computer specifications; based upon the use of WFI's information, the codefendants would be ready immediately to mill and lathe inserts for the same products sold by WFI; Paul Winkler intended that once PWP had received sufficient equipment and enhanced its production capacity, it would develop its own products; the codefendants had also conceived a new technology allowing for a higher rate

of production; they intended to first put this new technology to use at PWP; the codefendants had further developed at WFI a "co-extrusion" technology that reduced production costs; they intended to first use that technology in the new venture; with Paul Winkler's authorization, potential investors in PWP were brought in to observe WFI operations; the codefendants had contacted WFI customers and received commitments to order products from PWP; the WFI customers were told that Paul Winkler had been terminated by WFI; those customers were told "that there would be great difficulties in filling continuing orders to WFI based upon the termination of Paul Winkler and the disruption caused thereby"; in addition, the codefendants had scheduled overproduction of products at WFI; the overproduction was intended for those WFI customers that had committed to ordering from the new venture; the overproduction was run so WFI customer's would not experience a shortage of products while PWP got up and running; Paul Winkler had conceived and directed a strategy for the resignation of WFI managers; Paul Winkler wanted Gary Stenger, a WFI employee, to stay on at WFI to ensure the aforementioned overproduction was maintained; another future PWP employee, Hector Aparicio, agreed to remain at WFI; Mr. Aparicio was to contact targeted WFI employees and send them to the PWP facility to discuss employment with the new company; Paul Winkler promised the WFI team, including Mr. Stenger and Mr. Aparicio, that PWP would pay them the same or greater salary and other "perks" as they were presently receiving; among the targeted WFI employees were all of the operators in its milling center; the codefendants located PWP only a few miles from the WFI plant; this was done so that WFI employees would not have any greater distance to travel to work after they joined PWP; the WFI mill operators subsequently resigned and joined PWP; when the computer-controlled milling machinery arrived at the PWP plant, the former WFI operators were able immediately to begin producing products; they were able to do so because Mr. Brown had used the stolen computer design specifications to design the inserts to produce the same products as had been manufactured at WFI; Paul Winkler had said "they were going to take WFI's customers"; Colin Winkler had said "they were 'out to bury' WFI"; the codefendants had convinced Albino Hernandez, the head supply and warehouse employee at WFI, to leave the company; Mr. Hernandez was the key employee in the scheduling and shipping of WFI's products; Colin Winkler was "very excited" that WFI's loss of Mr. Hernandez "would cause the scheduling and shipping of product at WFI to be thrown into confusion"; Christopher Winkler said Mr. Hernandez's resignation from WFI "was 'going to fix them' and that it was going to be 'chaotic' when he leaves."

After investing in and becoming officers and directors of PWP, defendants conducted an investigation as to any ongoing use of WFI's confidential

information. As will be noted, defendants contend this investigation is a complete defense to the present lawsuit. Defendants have made this argument both in the trial court and now on appeal. Plaintiffs disputed the sufficiency of defendants' investigation. Plaintiffs presented evidence Mr. Maroofian was given no specific direction on how to conduct the investigation. After initiating the investigation, Benjamin Nazarian had no further contact with Mr. Maroofian about the inquiry into the use of WFI confidential information. The focus of the investigation was on what was being done at the time of the inquiry, not what activities had occurred previously. Neither Benjamin Nazarian, who instituted the investigation, nor Mr. Maroofian, who conducted the inquiry, ever read the deposition testimony of the former WFI management team members given in this case. Mr. Maroofian never talked to Paul Winkler as part of his investigation. In addition, defendant's retained expert, William McConnell, concluded that in his opinion PWP had independently designed and produced its products. However, Mr. McConnell did not investigate what PWP had actually done or what sources it had used to design and produce its products. Further, Mr. McConnell's declaration addressed only the alleged misappropriation of WFI's product design specifications and manufacturing processes. Mr. McConnell did not investigate and expressed no opinion as to the alleged theft of confidential financial and customer information or other acts of unfair competition. In February 1999, defendants were specifically notified in writing by plaintiffs' counsel that ongoing use of the allegedly misappropriated knowledge was wrongful. Nevertheless, defendants continued to invest money in PWP.

Defendants filed a reply in support of their summary judgment motion. They presented evidence, inter alia, that prior to investing in PWP they had been assured the corporation was not engaged in any unlawful conduct.

The trial court found no basis for imposing personal liability against defendants. Therefore, it granted a summary judgment in their favor. The parties raised evidentiary objections in the trial court. However, they did not secure any rulings on those objections. As a result, the objections have been waived and we treat all of the evidence as having been properly admitted. (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186-1187, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121]; *Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th at p. 670, fn. 1.)

### DISCUSSION

. Defendants contend they cannot be held personally liable for any misappropriation of trade secrets or other tortious conduct by the codefendants. They do not specifically contend, except with respect to customer lists,

that there was no misappropriation of trade secrets. Nor do defendants assert that insufficient information was known to them to raise a triable issue whether they knew or had reason to know the codefendants' conduct was tortious. Stated differently, they do not claim there was no indication trade secrets had or may have been misappropriated or that other improper conduct had occurred. Rather, defendants contend: they cannot be held liable for alleged torts that occurred before they invested in or became directors of PWP; any continuing wrongful conduct is not a basis for imposing *vicarious liability* on them; they are not liable for any mere nonfeasance in response to plaintiffs' cease-and-desist demand; there is no liability for nonfeasance causing only pecuniary harm; they had no independent duty to plaintiffs; they did not personally acquire any trade secrets; they cannot be liable based on whether they should have known about the corporate tort; they cannot be said to have used or acquired trade secrets by virtue of their director status; they cannot be liable for conspiracy absent an independent duty and an underlying wrong; and reliance on their investigation was not clearly unreasonable under the circumstances. For the reasons stated below, we disagree.

 Corporate director or officer status neither immunizes a person from personal liability for tortious conduct nor subjects him or her to vicarious liability for such acts. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 505 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447] (hereafter *Frances T.*); 18B Am.Jur.2d (1985) Corporations, § 1877.) As the Supreme Court held in *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 595 [83 Cal.Rptr. 418, 463 P.2d 770]: "Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done. They may be liable, under the rules of tort and agency, for tortious acts committed on behalf of the corporation. [Citations.]" As the Supreme Court explained in *Frances T.*: "It is well settled that corporate directors cannot be held *vicariously* liable for the corporation's torts in which they do not participate. Their liability, if any, stems from their own tortious conduct, not from their status as directors or officers of the enterprise. [Citation.] '[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct.' [Citation.] [¶] Directors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct. [Citations.] [¶] Directors are liable to third persons injured by their own tortious conduct regardless of

whether they acted on behalf of the corporation and regardless of whether the corporation is also liable. [Citations.] This liability does not depend on the same grounds as 'piercing the corporate veil,' on account of inadequate capitalization for instance, but rather on the officer or director's personal participation or specific authorization of the tortious act. [Citation.]" (*Frances T., supra,* 42 Cal.3d at pp. 503-504, original italics, fn. omitted.) Shareholders are likewise not normally liable for a corporation's torts, "but personal liability may attach to them . . . when [they] specifically direct[] or authorize[] the wrongful acts." (*Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 785; 18B Am.Jur.2d, *supra,* Corporations, § 1829.)

A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts. (*Frances T., supra,* 42 Cal.3d at pp. 503-504; *Spahn v. Guild Industries Corp.* (1979) 94 Cal.App.3d 143, 157, fn. 9 [156 Cal.Rptr. 375]; *Murphy Tugboat v. Shipowners & Merchants Towboat* (N.D.Cal. 1979) 467 F.Supp. 841, 852, affd. (9th Cir. 1981) 658 F.2d 1256; 18B Am.Jur.2d, *supra,* Corporations, § 1877; 3A Fletcher Cyclopedia of the Law of Private Corporations (perm. rev. ed. 1994) § 1135.) As the Supreme Court held in *Frances T., supra,* 42 Cal.3d at pages 508-509, "To maintain a tort claim against a director in his or her personal capacity, a plaintiff must first show that the director specifically authorized, directed or participated in the allegedly tortious conduct [citation]; *or that although they specifically knew or reasonably should have known* that some hazardous condition or activity under their control could injure plaintiff, *they negligently failed to take or order appropriate action to avoid the harm* [citations]. The plaintiff must also allege and prove that an ordinary prudent person, knowing what the director knew at that time, would not have acted similarly under the circumstances." (Italics added.) In *Spahn v. Guild Industries Corp., supra,* 94 Cal.App.3d at page 157 and footnote 9, the Court of Appeal held officers and directors of a corporation were personally liable for fraud committed by a managerial employee because they knew about and allowed the tortious conduct to occur. In addition, corporate directors and officers may be held personally liable, as conspirators, for violating their own duties towards persons injured by the corporation's tort. (*Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 48; *Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d at p. 785.)

The legal fiction of the corporation as an independent entity was never intended to insulate officers and directors from liability for their own tortious conduct. (*Frances T., supra,* 42 Cal.3d at pp. 507-508; *Michaelis v. Benavides* (1998) 61 Cal.App.4th 681, 688 [71 Cal.Rptr.2d 776].) The Supreme Court has held: "The legal fiction of the corporation as an independent entity—and the special·benefit of limited liability permitted thereby

—is intended to insulate stockholders from personal liability for corporate acts and to insulate officers from liability for corporate contracts; . . ." (*Frances T., supra,* 42 Cal.3d at pp. 507-508.) A corporate officer or director, like any other person, owes a duty to refrain from injuring others. In the context of a negligence claim, the Supreme Court has held that, like any other person, "directors individually owe a duty of care, independent of the corporate entity's own duty, to refrain from acting in a manner that creates an unreasonable risk of personal injury to third parties." (*Frances T., supra,* 42 Cal.3d at p. 505.) Stated differently, the Supreme Court held: "Like any other citizen, corporate officers have a societal duty to refrain from acts that are unreasonably risky to third persons even when their shareholders or creditors would agree that such conduct serves the institution's best interests. . . . 'The only duty which an executive officer of a corporation owes to a third person, whether he be an employee of the corporation or a complete stranger, is the same duty to exercise due care not to injure him which any person owes to another. If an injury is sustained by a third party as the result of the independent negligence of the corporate officer, or as the result of a breach of the duty which that officer, as an individual, owes to the third party, then the injured third party may have a cause of action for damages against the officer personally.' [Citation.]" (*Frances T., supra,* 42 Cal.3d at p. 506, fn. 12.) If a corporate officer or director were not liable for his or her own tortious conduct, he or she "could inflict injuries upon others and then escape liability behind the shield of his or her representative character, even though the corporation might be insolvent or irresponsible." (*Frances T., supra,* 42 Cal.3d at p. 505.)

The California Supreme Court has held that the rule imposing liability on an officer or director for participation in or authorization of tortious conduct has its roots in agency law. (*Frances T., supra,* 42 Cal.3d at pp. 504-505; *Seagate Technology v. A.J. Kogyo Co.* (1990) 219 Cal.App.3d 696, 702 [268 Cal.Rptr. 586].) Directors and officers are agents of the corporate principal. (*Frances T., supra,* at p. 505; see *APSB Bancorp. v. Thornton Grant* (1994) 26 Cal.App.4th 926, 931 [31 Cal.Rptr.2d 736].) And an agent is liable for her or his own acts, regardless whether the principal is also liable. (*Frances T., supra,* at p. 505; Civ. Code, § 2343.) Civil Code section 2343 provides: "One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: [¶] . . . [¶] 3. When his acts are wrongful in their nature." This rule applies to officers and directors. (*Frances T., supra,* 42 Cal.3d at p. 505; *Mears v. Crocker First Nat. Bank* (1948) 84 Cal.App.2d 637, 642 [191 P.2d 501].)

All persons who are shown to have participated in an intentional tort are liable for the full amount of the damages suffered. (*Golden v. Anderson,*

*supra,* 256 Cal.App.2d at pp. 719-720; *Joanaco Projects, Inc. v. Nixon & Tierney Constr. Co.* (1967) 248 Cal.App.2d 821, 832-833 [57 Cal.Rptr. 48]; *McClory v. Dodge* (1931) 117 Cal.App. 148, 153 [4 P.2d 223], disapproved on another point in *Mary Pickford Co. v. Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 522 [86 P.2d 102].) This rule applies to intentional torts committed by shareholders and those acting in their official capacities as officers or directors of a corporation, even though the corporation is also liable. (*Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 53, fn. 20 [6 Cal.Rptr.2d 602] [corporate shareholders and officers personally liable for misappropriation of trade secrets]; *Klein v. Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 76-79 [259 Cal.Rptr. 149] [sole general partner could be personally liable for conspiring to violate the Sherman Act on behalf of limited partnership]; *Golden v. Anderson, supra,* 256 Cal.App.2d at pp. 719-720 [corporate officers conspired to interfere with contractual relationship]; *Joanaco Projects, Inc. v. Nixon & Tierney Constr. Co., supra,* 248 Cal.App.2d at pp. 832-833 [corporate stockholders participated in fraud]; *Price v. Hibbs* (1964) 225 Cal.App.2d 209, 222 [37 Cal.Rptr. 270] [corporate officials conspired to induce breach of contract and to defraud]; *Granoff v. Yackle* (1961) 196 Cal.App.2d 253, 256-257 [16 Cal.Rptr. 394] [corporate officers personally liable for misappropriation of another's money or property]; *McClory v. Dodge, supra,* 117 Cal.App. at pp. 152-154 [corporate directors personally liable for misappropriation of plaintiff's stock when they knew or should have known conduct was wrongful]; *Vujacich v. Southern Commercial Co.* (1913) 21 Cal.App. 439, 442-443 [132 P. 80] [director who knew or had reason to know of corporation's misappropriation of another's money was personally liable]; Civ. Code, § 2343; 3A Fletcher Cyclopedia of the Law of Private Corporations, *supra,* § 1135.)

██ Misappropriation of trade secrets is an intentional tort. (Civ. Code, § 3426.1; *Vacco Industries, Inc. v. Van Den Berg, supra,* 5 Cal.App.4th at p. 53.) It is defined in the Uniform Trade Secrets Act, Civil Code section 3426.1, subdivision (b), as follows: " *'Misappropriation' means*: [¶] (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or [¶] (2) Disclosure *or use of a trade secret of another* without express or implied consent *by a person who*: [¶] (A) Used improper means to acquire knowledge of the trade secret; or [¶] (B) *At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:* [¶] *(i) Derived from or through a person who had utilized improper means to acquire it;* [¶] (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or [¶] (iii) *Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use*; . . . ." (Italics added.) Under the Uniform Trade Secrets Act (Civ. Code,

§ 3426 et seq.), an actual or threatened misappropriation of such confidential information may be enjoined (Civ. Code, § 3426.2) and a complainant may recover damages for unjust enrichment, or receive payment of a reasonable royalty (Civ. Code, § 3426.3).

Moreover, defendants had an independent obligation under the Uniform Trade Secrets Act to refrain from a tortious invasion of plaintiffs' proprietary rights. (Civ. Code, §§ 2343, subd. 3, 3426 et seq.; *Vacco Industries, Inc. v. Van Den Berg, supra*, 5 Cal.App.4th at p. 53 & fn. 20.) ■ Under the plain terms of the Uniform Trade Secrets Act, defendants may be personally liable if: they used, through the corporation, WFI's trade secrets; at the time of the use of the confidential information they knew or had reason to know that knowledge of the trade secrets was derived from or through a person who had improperly acquired the knowledge, or the secrets were obtained by a person who owed a duty to plaintiffs to maintain the secrecy. (*Ibid.*) Employing the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information, all constitute use. (Rest.3d Unfair Competition, § 40, com. c, p. 455.) Use of a trade secret without knowledge it was acquired by improper means does not subject a person to liability unless the person receives notice that its use of the information is wrongful. (*Components for Research, Inc. v. Isolation Products, Inc.* (1966) 241 Cal.App.2d 726, 729-730 [50 Cal.Rptr. 829]; Rest.3d Unfair Competition, *supra*, § 40, com. d, p. 457.)

■ In circumstances similar to those of the present case, the Supreme Court has held that a corporate officer who was aware of or ratified acts of unfair competition, who cooperated in an individual's breach of his fiduciary duties to his former corporation, and who benefited from the misconduct, was personally liable. (*Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327, 353 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795].) John T. Bender was the president of Matthew Bender & Co. Judson B. Glen was the president and a director of Bancroft-Whitney Company. Both corporations were in the business of publishing law books. Mr. Glen, while serving as president of Bancroft-Whitney, commenced negotiations with Mr. Bender concerning the establishment of a western division of Matthew Bender. Without resigning from Bancroft-Whitney, Mr. Glen: entered into a contract with Matthew Bender to become president of its new division; solicited Bancroft-Whiney executive staff and other personnel to join the new division; and disclosed Bancroft-Whitney's trade secret and confidential information to Mr. Bender. The Supreme Court described the gravamen of the action against Mr. Bender and Matthew Bender as "relat[ing] to their role in cooperating in [Mr.] Glen's breach [of his fiduciary duties to Bancroft-Whitney] for the purpose

of obtaining the employment of these persons by [Matthew Bender]." (*Id.* at p. 332.) The Supreme Court held Mr. Bender was guilty of unfair competition for having cooperated in and having reaped the benefits of Mr. Glen's breach of fiduciary duties owed to Bancroft-Whitney. (*Ibid.*) The Supreme Court held: "It is clear from the evidence . . . that [Mr. ] Bender was aware of or ratified [Mr.] Glen's breach of his fiduciary duties in all but a few respects, that he cooperated with [Mr.] Glen in the breach, and that he received the benefits of [Mr.] Glen's infidelity. . . . Under all the circumstances, [Mr.] Bender and [Matthew] Bender Co. must be held liable for their part in [Mr.] Glen's breach of his fiduciary duties. [Citations.] They encouraged the sowing and reaped the benefit. They cannot now disclaim the burden." (*Id.* at p. 353.) In the present case, there is no evidence defendants encouraged the codefendants to engage in the *initial* wrongful conduct vis-à-vis plaintiff, their former employer. However, plaintiffs' theory of liability is essentially the same as that in *Bancroft-Whitney Co.* Plaintiffs allege defendants were aware of and ratified and benefited from the codefendants' misconduct, and that defendants knowingly purchased a controlling interest in a corporation whose sole assets arose from tortious conduct by the codefendants.

In *Vacco Industries, Inc. v. Van Den Berg, supra,* 5 Cal.App.4th at pages 49-53, the Court of Appeal held, albeit without extensive discussion, that two former employees who went into competition with their former employer were personally liable for misappropriation of trade secrets. One of the defendants, Tony Van Den Berg, had misappropriated the former employer's trade secrets. Another defendant, Thomas Eastlack, had embarked on the new venture with Mr. Van Den Berg. They acquired all the stock of an existing corporation. They were held jointly liable with their corporation for the tort committed in the corporation's name. It appears Mr. Eastlack was a shareholder and corporate officer who did not participate in the initial misappropriation. Mr. Eastlack's liability was apparently premised on his knowing use of misappropriated trade secrets. In *Components for Research, Inc. v. Isolation Products, Inc., supra,* 241 Cal.App.2d at pages 729-730, on which plaintiffs rely, two corporate directors were notified the corporation was making unauthorized use of trade secrets. However, the corporation continued to use the misappropriated information. The Court of Appeal held the directors were personally liable. The basis for the finding of personal liability is not clearly explained. One of the directors had become a consultant for the plaintiff corporation at the same time he began assisting in the formation of the competing venture. The other director had funded the new business. The imposition of personal liability appears to have been based on the continued use of the misappropriated information with knowledge of the wrongdoing, either from the outset of the new venture, or upon

receiving notice of the improper conduct.[6] So read, both *Vacco Industries, Inc.*, and *Components for Research, Inc.*, are consistent with the Uniform Trade Secrets Act and the law regarding corporate official liability for intentional torts.

In the present case, plaintiffs presented sufficient evidence to raise a triable issue whether, when defendants invested in PWP, became majority shareholders, officers and directors of PWP, effectively took control of the corporation, hired personnel to run it, and continued its operations, they knew or, with respect to trade secret misappropriation, had reason to know, that their codefendants had engaged in tortious conduct harmful to WFI. In a nutshell, there was evidence from which a trier of fact could reasonably infer defendants, in anticipation of enormous corporate and personal profit, knowingly invested at a bargain price in a corporation whose sole business assets consisted of stolen confidential information and processes, and subsequently controlled the entity which was engaging in unlawful conduct. Further, plaintiffs presented sufficient evidence as to the scope and results of defendants' investigation to raise a triable issue whether, even if defendants did not know about the prior misconduct, they unreasonably took no action to prevent ongoing injury to WFI. A reasonable trier of fact could conclude there was no real attempt to determine, and no basis upon which to conclude, that PWP had not engaged in, and was not continuing to participate in, tortious conduct.

Defendants contend they could not have participated in any trade secret violation because the alleged misappropriation occurred *before* they invested in or became directors of PWP. However, misappropriation is not limited to the initial act of improperly acquiring trade secrets; the use and continuing use of the trade secrets is also misappropriation. (Civ. Code, § 3426.1.) Hence, that the codefendants misappropriated WFI's trade secrets before defendants first invested in PWP does not absolve defendants of liability. (Civ. Code, § 3426.1; Rest.3d Unfair Competition, *supra*, § 40, com. d, p. 457.)

Defendants argue their personal liability cannot be premised on the fact they invested in PWP, served as directors of the corporation, and refused to

---

[6]Defendants attempt to distinguish *Components for Research, Inc.*, on the grounds the directors *themselves* were *using* the trade secrets. However, the dispositive paragraph of the opinion states only that: "[Defendants] Montali and Ross were notified in July 1962 that the corporation of which they were directors was making unauthorized use of trade secrets improperly transmitted to it by the Biancos, their fellow directors. They and the corporation nonetheless continued to use these manufacturing processes. Thus they, too, are liable. [Citation.]" (*Components for Research, Inc. v. Isolation Products, Inc., supra,* 241 Cal.App.2d at pp. 729-730.)

comply with plaintiffs' cease-and-desist demand. However, plaintiffs' evidence goes beyond those facts. As discussed above, it raises a reasonable inference that, and hence a triable issue whether, defendants, in pursuit of corporate and personal profit invested in PWP, took control of PWP, hired personnel to run PWC, and continued its operations, with knowledge or, with respect to trade secret misappropriation, with reason to know, that the codefendants had engaged in the alleged tortious acts and the corporation was engaged in unlawful conduct.

■ Defendants assert they concluded, in reasonable reliance on information, reports and expert opinion, that there was no continuing misappropriation. In *Frances T.*, *supra*, 42 Cal.3d at page 509, the California Supreme Court analyzed the principle of law relied upon by defendants as follows: "Although the statutory business judgment rule defined in sections 7231 and 309 concerns only the director's fiduciary duty to the corporation, and not to outsiders, we recognize—as the Legislature did—that '[t]he reference to "ordinarily prudent person" emphasizes the long tradition of the common law, in contrast to standards that might call for some undefined degree of expertise, like "ordinarily prudent businessman."' (Legislative Committee com., Deering's Ann. Corp. Code (1977) foll. § 309, p. 205.) We are mindful that directors sometimes must make difficult cost-benefit choices without the benefit of complete or personally verifiable information. For this reason, even if their conduct leads directly to the tortious injury of a third party, directors are not personally liable in tort unless their action, including any claimed reliance on expert advice, was clearly unreasonable under the circumstances known to them at that time. This defense of reasonable reliance is necessary to avoid holding a director personally liable when he or she reasonably follows expert advice or reasonably delegates a decision to a subordinate or subcommittee in a better position to act." (Fn. omitted; Corp. Code, §§ 309, 7231.[7])

■ Generally, an officer or director who commits a tort because he or she reasonably relied on expert advice or other information cannot be held

---

[7]Corporations Code section 309, subdivisions (b) and (c) provide: "In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following: [¶] (1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented. [¶] (2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence. [¶] (3) A committee of the board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence, so long as, in any such case, the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted. [¶] (c) A person who performs the duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon any alleged failure to discharge the person's obligations as

personally liable for the resulting harm. (*Frances T., supra,* 42 Cal.3d at p. 509, fn. 17; *Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 713 [57 Cal.Rptr.2d 798].) As noted above, there was evidence defendants conducted an investigation and found no ongoing use of WFI trade secrets. However, plaintiffs presented evidence sufficient to raise a triable issue whether the claimed reliance was clearly unreasonable under the circumstances known to defendants at the time. Defendants could not rely on information and expert opinion if they knew misappropriation and other tortious conduct had occurred. There is evidence which so indicates. Further, as noted previously, plaintiffs have raised sufficient questions about the scope and results of the investigation that a reasonable trier of fact could find reliance thereon was not reasonable given all the circumstances. (See pp. 1379-1380, *ante.*) A reasonable trier of fact could conclude the investigation did not go far enough under the circumstances. Mr. McConnell's declaration did not establish an absence of misappropriation; it could reasonably be construed, under the circumstances, as only demonstrating the codefendants *could have* produced PWP's products without reliance on WFI's trade secrets. Mr. McConnell expressed no opinion as to alleged misconduct beyond the theft of product designs and manufacturing processes. Whether defendants acted reasonably under the circumstances of this case is a question for the trier of fact. (*Frances T., supra,* 42 Cal.3d at pp. 511-512.)

Defendants contend *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc., supra,* 1 Cal.3d at pages 594-598, precludes stockholder, officer, or director liability for misappropriation of trade secrets premised on a knew or had reason to know standard. We disagree. *Haidinger-Hayes* was a negligence action. It did not involve intentional misconduct. It did not involve the Uniform Trade Secrets Act. That act imposes liability for intentional misconduct about which a person knew or had reason to know. Nothing in *Haidinger-Hayes* precludes shareholder, officer, or director liability for intentional torts, including misappropriation, or application to them of the standard for imposition of liability set forth in the Uniform Trade Secrets Act.

Defendants assert they have no liability to plaintiffs unless they *personally* used trade secrets. Defendants claim that to impose liability on them there would have to be evidence they were down on the shop floor designing or manufacturing PWP's products, or out soliciting customers. The decisional authority is to the contrary. Shareholders, officers, and directors of corporations have been held personally liable for intentional torts when they knew or had reason to know about but failed to put a stop to tortious conduct.

a director." Corporations Code section 7231 provides the same protection to a corporate director.

(*McClory v. Dodge, supra,* 117 Cal.App. at pp. 152-154 [directors who knew, or by the exercise of reasonable diligence and care could and would have known, that plaintiff's stock had been converted to the use of the corporation were personally liable]; *Vujacich v. Southern Commercial Co., supra,* 21 Cal.App. 439, 442-443 [director who either knew or could have obtained knowledge by the exercise of ordinary diligence was personally liable for conversion of plaintiff's funds to a corporate use]; see also *Mercer v. Dunscomb* (1930) 110 Cal.App. 28, 37 [293 P. 836].) Further, an officer's or director's knowing consent to, or approval or authorization of, wrongdoing suffices to impose personal liability. (*Frances T., supra,* 42 Cal.3d at pp. 508-509; *Spahn v. Guild Industries Corp., supra,* 94 Cal.App.3d at p. 157, fn. 9; *Murphy Tugboat v. Shipowners & Merchants Towboat, supra,* 467 F.Supp. at p. 852; 18B Am.Jur.2d, *supra,* Corporations, § 1877; 3A Fletcher Cyclopedia of the Law of Private Corporations, *supra,* § 1135.)

The argument advanced by defendants, that no potential personal officer or director liability arises absent evidence of defendants' personal use of trade secrets, was rejected by the United States District Court for the District of Colorado in *Powell Products, Inc. v. Marks* (D.Colo. 1996) 948 F.Supp. 1469, 1482-1483, in similar circumstances. In *Marks,* an employee misappropriated his former employer's confidential drawings and specifications for a machine that produced cosmetics applicators. The defendants financed the employee's subsequent efforts to build an applicator machine. They then formed a corporation that began selling cosmetics applicators in competition with the former employer, the plaintiff corporation. There was evidence the defendants knew the employee had worked for the plaintiff and the plaintiff owned a machine the design of which was confidential. Further, the defendants could not identify any reason for going into business with the employee other than he " 'had a good head on his shoulders.' " (*Id.* at p. 1481.) The defendants brought a summary judgment motion. They argued they could not be held personally liable for misappropriation of trade secrets under the Uniform Trade Secrets Act because there was no evidence they had *personally* used the plaintiff's trade secrets. The defendants asserted that at most they had participated in setting up a corporation and hiring an employee who used the plaintiff's trade secrets. The district court disagreed. It held a reasonable juror could find from the circumstantial evidence that the defendant directors had actively participated or wrongfully cooperated in the misappropriation of the plaintiff's trade secrets. (*Id.* at p. 1483.)

Similarly, in *National Rejectors, Inc. v. Trieman* (Mo. 1966) 409 S.W.2d 1, 44, an individual, Fred J. Melvin, misappropriated his then employer's trade secrets. Two other individuals, Rollyn C. Trieman and Albin S. Pierz, joined Mr. Melvin in incorporating the defendant corporation. The defendant

corporation used the plaintiff corporation's drawings and materials to produce products in competition with the plaintiff. The Supreme Court of Missouri held Mr. Trieman and Mr. Pierz, who did not participate in the actual misappropriation, but who joined with other defendants in forming the defendant corporation, would be liable to the plaintiff if they knew or should have known about the misappropriation.

Defendants misconstrue plaintiffs' theory of liability and argue that to say a director used or acquired trade secrets by virtue of their corporate status would impose personal liability in every trade secret case involving a corporation. Defendants assert that if we accept plaintiffs' analysis, then, hypothetically, a corporate director would be liable in every trade secret violations case. The fact defendants have omitted from this hypothetical scenario is that the corporate director or officer must have known or had reason to know of the misappropriation and then unreasonably participated in the unlawful conduct. Further omitted from defendants' theoretical situation is the fact that defendants purchased a corporation whose sole assets were purportedly corruptly acquired resources. Liability imposed on a corporate shareholder, officer, or director who knows or has reason to know about tortious misappropriation under these circumstances and allows it to occur is *not* vicarious.

## DISPOSITION

The judgment is reversed. Plaintiffs PMC, Inc., and Winkler Forming, Inc., are to recover their costs on appeal, jointly and severally, from defendants, Neil Kadisha, Benjamin Nazarian, Parviz Nazarian, and Pioneer Private Equity Fund LLC.

Grignon, J., and Armstrong, J., concurred.

A petition for a rehearing was denied April 7, 2000, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied June 21, 2000. Mosk, J., and Baxter, J., were of the opinion that the petition should be granted.